

**FILED**

Dec 22 2016, 9:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

M.T.V.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

December 22, 2016

Court of Appeals Case No.
36A05-1607-JV-1681

Appeal from the Jackson Superior
Court

The Honorable Bruce A.
MacTavish, Judge

Trial Court Cause No.
36D02-1602-JD-9

**Bailey, Judge.**

# Case Summary

M.T.V. appeals his adjudication of delinquency for Conspiracy to Commit Aggravated Battery, a Level 3 felony if committed by an adult.[1]  We affirm.

# Issues

M.T.V. raises the following restated issues:

I.    Whether the trial court abused its discretion when it:

    A.  Determined there was a sufficient foundation to admit records of M.T.V.'s Facebook conversations, and

    B.  Admitted statements made by M.T.V.'s coconspirator in those Facebook conversations; and

II.   Whether the evidence is sufficient to support M.T.V.'s adjudication.

# Facts and Procedural History

On January 13, 2016, when M.T.V. was sitting at a Seymour High School cafeteria table, M.T.V. stated that he and another student, B.E., were going to bring guns into the school on April 20, 2018.  M.T.V. said that the date was the same day as the Columbine shooting.  M.T.V. also said that he and B.E. had a

---

[1] Ind. Code § 35-42-2-1.5.

list and that a student, J.R., was first on the list. Another student at the lunch table reported M.T.V.'s statements to counselors and an investigation ensued. During the investigation, the Seymour Police Department ("SPD") obtained records from Facebook containing conversations between M.T.V. and B.E.

[4] On February 16, 2016, the State filed a delinquency petition alleging that M.T.V. committed an act that would be Conspiracy to Commit Murder if committed by an adult. The State later amended the petition, adding allegations of Conspiracy to Commit Aggravated Battery and Conspiracy to Commit Possession of Firearm on School Property.

[5] During a fact-finding hearing on May 20, 2016, the State sought to admit the Facebook conversations into evidence. M.T.V. objected, arguing that the Facebook records were not properly authenticated and that the conversations contained inadmissible hearsay. After hearing argument from M.T.V. and the State, the trial court admitted the conversations. When the hearing concluded, the juvenile court took the matter under advisement, and later entered a true finding for only one allegation, Conspiracy to Commit Aggravated Battery.

[6] M.T.V. now appeals.

# Discussion and Decision

## Admission of Evidence

[7] Although juvenile delinquency hearings are civil in nature, a formal fact-finding hearing is analogous to a criminal trial and the rules of evidence apply to the

same extent as in a criminal case. *N.L. v. State*, 989 N.E.2d 773, 779 (Ind. 2013). A trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). We review rulings on the admissibility of evidence "for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Guilmette v. State*, 14 N.E.3d 38, 40-41 (Ind. 2014).

## A. Authentication of Facebook Records

[8] Here, M.T.V. argues that the juvenile court abused its discretion in admitting copies of the Facebook conversations between M.T.V. and B.E.[2] Indiana Rules of Evidence Rule 901(a) provides that "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). Absolute proof of authenticity is not required. *Pavlovich v. State*, 6 N.E.3d 969, 976 (Ind. Ct. App. 2014), *trans. denied*. Rather, the proponent of the evidence must establish only a reasonable probability that the evidence is what it is claimed to be, and may use direct or circumstantial evidence to do so. *Id.* Once this reasonable probability is shown, any inconclusiveness of the evidence's connection with the events at

---

[2] One of M.T.V.'s arguments focuses on whether the Facebook conversations warranted admission as business records under Indiana Evidence Rule 803(6). Finding another basis for the proper admission of the conversations, we need not reach this issue.

issue goes to evidential weight, not admissibility. *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*.

[9] "Letters and words set down by electronic recording and other forms of data compilation are included within Rule 901(a)." *Wilson v. State*, 30 N.E.3d 1264, 1268 (Ind. Ct. App. 2015), *trans. denied*. Moreover, Evidence Rule 901(b) provides a non-exhaustive list of evidence that satisfies the authentication requirement. One example is where there is evidence describing a process or system and showing that it produces an accurate result. Evid. R. 901(b)(9). Another example, provided in Evidence Rule 901(b)(4), is where, taken together with all the circumstances, the evidence has distinctive characteristics in appearance, contents, or substance. Federal Rule of Evidence 901(b)(4) uses language identical to that of Indiana Rule of Evidence 901(b)(4). "We have previously acknowledged that federal courts have recognized Federal Rule of Evidence 901(b)(4) as one of the most frequently used means to authenticate electronic data, including text messages and emails." *Wilson*, 30 N.E.3d at 1268 (citing *Hape v. State*, 903 N.E.2d 977, 989 (Ind. Ct. App. 2009)); *see, e.g.*, *United States v. Lewisbey*, No. 14-2236, slip op. at 5-7 (7th Cir. Dec. 9, 2016) (looking to Federal Rule of Evidence 901(b)(4) when concluding that certain text messages and Facebook posts were properly authenticated).

[10] In *Wilson*, we addressed whether messages sent through a Twitter social media account were properly authenticated as having been authored by the defendant. 30 N.E.3d at 1268. There, a witness testified that she often communicated with Wilson on Twitter and had general knowledge of the account by its

"@Nell_FearNoMan" header. *Id.* at 1268-69. The contents of the account records included pictures depicting Wilson holding guns that matched the description of those used in the crime. *Id.* at 1269. Moreover, there was testimony that Wilson was affiliated with two gangs, and the @Nell_FearNoMan Twitter account frequently used terms referring to those gangs, showing that the author of the messages was affiliated with them. *Id.* We concluded that "taken together, the witness testimony identifying the Twitter account as belonging to Wilson and the content posted on the account, including pictures and gang references, are more than sufficient to authenticate the Twitter posts as being authored by Wilson." *Id.*

[11]　Here, in an interview with law enforcement, M.T.V. admitted to having Facebook conversations with B.E. and said that, in those conversations, B.E. made threats to shoot up the school on April 20, 2018. M.T.V. also said that B.E. asked M.T.V. for help conducting the shooting. The Facebook records introduced at the hearing contain the content M.T.V. said they would. Moreover, in addition to having distinctive characteristics in content, the Facebook records were also supported by an affidavit from Facebook's authorized records custodian, Kelsey McIntosh ("McIntosh"). The sworn affidavit specified, *inter alia*, that the records were made and kept by Facebook's automated systems and were made at or near the time the Facebook user transmitted the information. At the hearing, Detective Foster testified that the procedure he used to obtain the Facebook records was an ordinary procedure that he had previously used for criminal investigations involving Facebook.

We conclude that, collectively, the State established the requisite reasonable probability that the Facebook records corresponded to M.T.V.'s and B.E.'s accounts and that M.T.V. and B.E. authored the conversations therein. Therefore, the juvenile court did not abuse its discretion with respect to authentication. Our review does not end here, however, because the content of the authenticated conversations must also be admissible.

## B.   Admission of Coconspirator's Statements

M.T.V. argues that the Facebook conversations contain inadmissible hearsay. Ordinarily, hearsay is any statement made out of court and offered to prove the truth of the matter asserted. Evid. R. 801(c). Evidence Rule 801(d), however, specifies that certain statements that would otherwise constitute hearsay are, by rule, not hearsay at all. For example, an opposing party's statement is not hearsay. Evid. R. 801(d)(2). This is so when the opposing party is himself making the statement. Evid. R. 801(d)(2)(A). It is also the case when an opposing party's coconspirator is making the statement. Evid. R. 801(d)(2)(E). Importantly, however, to be admissible under this rule, the coconspirator's statement must be made in furtherance of the conspiracy. Furthermore, the coconspirator's "statement does not by itself establish … the existence of the conspiracy …." *Id.* Rather, the State must introduce "independent evidence" of the conspiracy before a coconspirator's statement will be admissible as non-hearsay. *Lander v. State*, 762 N.E.2d 1208, 1213 (Ind. 2002).

M.T.V. does not argue that his own statements were inadmissible. Rather, M.T.V. argues that B.E.'s statements were inadmissible because the State failed

to introduce independent evidence of a conspiracy, and instead relied solely on B.E.'s statements in the Facebook records. The evidence favorable to the adjudication, however, included testimony from the student at M.T.V.'s lunch table. The student heard M.T.V. say that he and B.E. planned to bring guns into the school, that they had a list, and J.R. was first on their list. Moreover, M.T.V.'s side of the Facebook conversations constituted evidence as well. Here, the independent evidence is sufficient to establish the existence of conspiracy between M.T.V. and B.E. for the purposes of Evidence Rule 801(d). *See Mayhew v. State*, 537 N.E.2d 1188, 1190-91 (Ind. 1989) (finding statements made by a coconspirator admissible where a witness testified that the defendant told her about the conspiracy). Therefore, the juvenile court did not abuse its discretion in admitting B.E.'s statements.

## Sufficiency of the Evidence

[15]  M.T.V. argues that the evidence is insufficient to support his delinquency adjudication. In a juvenile delinquency adjudication proceeding, the State must prove every element of the offense beyond a reasonable doubt. *A.B. v. State*, 885 N.E.2d 1223, 1226 (Ind. 2008). When reviewing the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Al-Saud v. State*, 658 N.E.2d 907, 909 (Ind. 1995). Rather, we consider only the evidence and reasonable inferences most favorable to the adjudication. *Id.* We affirm if the evidence and those inferences constitute substantial evidence of probative value to support the adjudication. *A.B.*, 885 N.E.2d at 1226.

[16] Here, M.T.V. was adjudicated a delinquent for Conspiracy to Commit Aggravated Battery, a Level 3 felony if committed by an adult. The statute defining Aggravated Battery provides that a "person who knowingly or intentionally inflicts injury on a person that creates a substantial risk of death … commits aggravated battery, a Level 3 felony." I.C. § 35-42-2-1.5. Moreover, a person "conspires to commit a felony when, with intent to commit the felony, the person agrees with another person to commit the felony." I.C. § 35-41-5-2(a). The State "must allege and prove that either the person or the person with whom he or she agreed performed an overt act in furtherance of the agreement." I.C. § 35-41-5-2(b). In other words, to prove the conspiracy aspect of the State's allegations, the State had to prove that M.T.V. and B.E. formed an agreement to commit the crime and that one of them took an overt act in furtherance of that agreement. I.C. § 35-41-5-2.

[17] To prove the existence of a conspiratorial agreement, "it is not necessary to present direct evidence of a formal express agreement between conspirators." *Chambers v. State*, 526 N.E.2d 1176, 1178 (Ind. 1988). Rather, "[s]uch intent may be inferred from circumstantial evidence alone, including overt acts of the parties in pursuance of the criminal act." *Id.* As to the overt act, it "need not rise to the level of a 'substantial step' required for an attempt to commit the felony.'" *Owens v. State*, 929 N.E.2d 754, 756-57 (Ind. 2010) (quoting the attempt statute, I.C. § 35-41-5-1). Indeed, whereas a substantial step must be an act beyond mere preparation, there is no such requirement for an overt act. *Conn v. State*, 948 N.E.2d 849, 854 (Ind. Ct. App. 2011) (finding that surveilling

the victim's home at the request of the coconspirator was an overt act); *see Dickenson v. State*, 835 N.E.2d 542, 552-53 (Ind. Ct. App. 2005) (finding that helping to "prepare a letter concerning the details" of an agreement to commit murder was a valid overt act), *trans. denied*. Ultimately, "[t]he crime of conspiracy is complete upon the agreement and the performance of an overt act in furtherance of the agreement." *Smith v. State*, 655 N.E.2d 532, 540 (Ind. Ct. App. 1995), *trans. denied*. Thus, the length of time between the overt act and commission of the underlying felony, if ever committed or attempted, is "of no significance to the elements of the crime [of conspiracy] itself." *Id.*

[18] Here, the State alleged that M.T.V. committed Conspiracy to Commit Aggravated Battery between October 31, 2015 and January 15, 2016, and that M.T.V.'s alleged coconspirator, B.E., committed certain overt acts, including "drawing a map of a classroom searing [sic] chart with J.R.'s seat targeted, drawing a map of the 300 building of Seymour High School, setting a specific date for a school shooting to occur at Seymour High School … discuss[ing] stealing a knife from school, discuss[ing] how to conceal murder evidence, discuss[ing] torturing J.R. prior to killing him, and/or plann[ing] to break into his parent's gun safe …." (Appellant's App. at 129.)

[19] The evidence favorable to the adjudication included testimony about M.T.V.'s statements at the lunch table. The evidence also included M.T.V.'s statements to law enforcement during an interview, where M.T.V. admitted that he and B.E. had Facebook conversations and that, during some of those conversations, B.E. mentioned making threats to shoot up the school on April 20, 2018. In the

interview, M.T.V. said that B.E. had asked him to help with the shooting, and that two students, J.R. and G.M., were targeted. M.T.V. said that J.R. was targeted because B.E. had a "true disliking" for him. (Tr. Vol. II at 27.)

[20] The State also introduced drawings found in B.E.'s binder. One drawing was of a school building. The drawing included teacher names on classrooms and showed the locations of classroom doors. Another drawing depicted the layout of a math classroom where B.E. had class with both J.R. and G.M. On the drawing, B.E. had shaded in his seat and another student's seat, and had drawn an "X" over J.R.'s seat. The depicted seating chart reflected a seating arrangement the math teacher had implemented around October 2015. It was not otherwise clear when the drawings were created.

[21] Much of the offered evidence consisted of M.T.V.'s Facebook conversations. In one Facebook conversation on October 20, 2015, M.T.V. mentioned to a friend that he was "scared like hell" for his sanity and the safety of two people, but said he would not give out names or what he thought was important information. (Tr. Vol. II at 77-78; State's Ex. 2.) A couple of weeks later, M.T.V. sent a message to B.E. describing possible ways to avoid being identified "[i]f you are going to do a murder," and noted to B.E. that he was proving his knowledge to him. (Tr. Vol. II at 81-82; State's Ex. 3). On November 11, 2015, M.T.V. sent B.E. a Facebook message indicating that M.T.V. was having homicidal thoughts. (Tr. Vol. II at 90; State's Ex. 5.) Two days later, M.T.V. and B.E. had the following conversation on Facebook, which the State argued reflected an agreement between M.T.V. and B.E.:

B.E.: Me and [J.R.] have a mutual thing going on … He wants to get lots of sleep … I want him to get nonstop sleep … I'm pissed … I hate [J.R.]

M.T.V.: What do you think the most painful death would be?

B.E.: Let's test everything in [J.R.] as we can

M.T.V.: I was thinking that … As many cuts as possible … Without severing any important organs or blood vessles [sic]

B.E.: Implement through the ass and out the mouth … You last between a few hours and a few days[.]

(Tr. Vol. II. at 85, 131; State's Ex. 4.)

[22] A week later, M.T.V. and B.E. had a Facebook conversation where B.E. said he wanted to kill J.R. B.E. noted that B.E. "could steal a knife … and kill [J.R.] with it and then take out as many people as possible," to which M.T.V. suggested that B.E. "could buy a gun" instead. (Tr. Vol. II at 143-44; Resp't's Ex. J.) B.E. replied that B.E. could attempt to break into his father's gun safe so he wouldn't have to buy a weapon. (Tr. Vol. II at 145; Resp't's Ex. J.)

[23] The date April 20, 2018 also came up in Facebook conversations. In December 2015, M.T.V. mentioned that date to B.E., and B.E. replied "#4/20/18 … Better make that a trend …." (Tr. Vol. II at 91; State's Ex. 6.) Later in the conversation, B.E. said, "I'll have fun with … [a student's] head after u cut it off," and M.T.V. replied, "You have fun with [J.R.]'s dick after you cut it off and make him suck his own cock." (Tr. Vol. II at 91; State's Ex. 6.) The next

day, B.E. sent a message describing a scene in which he fires a gun at school and hits J.R., and M.T.V. replied, "Well, nice shooting, Texas" (Tr. Vol. II at 95; State's Ex. 8). On December 25, 2015, M.T.V. promised a friend on Facebook that "everything will be better" on April 20, 2018. (Tr. Vol. II p. 92-93; State's Ex 7.) Later that day, M.T.V. and B.E. had the following exchange:

M.T.V.: Get a job. Get money. Get a gun.

B.E.: Or slit my wrist

M.T.V. But then there would be no 4/20/18

B.E.: Good

M.T.V.: But that's my favorite holiday.

B.E.: Unless you help out it won't be

M.T.V.: How the hell can I help out?

B.E.: Do it with me … It's that simple … Or … Give our guest [J.R.] a surprise

M.T.V.: How? I have no access to weaponry.

B.E.: Bring a knife … Slit the fuckers [sic] throat

M.T.V.: I'd much rather a gun XD. I'm not a fan of knives … If we get the proper gear, I will consider it, until then, I am saying I can't help you[.]

(Tr. Vol. II at 139-40; Resp't's Ex. I.) Weeks after B.E. and M.T.V. directly discussed M.T.V.'s potential participation in the shooting, M.T.V. made statements at lunch that he and B.E. were going to conduct such a shooting.

[24] M.T.V.'s argument that "[t]here is no conspiracy brewing in the fantastical misadventures of these two teenaged boys," (Appellant's Br. at 16), amounts to a request to reweigh the evidence, which we must decline. *See Al-Saud*, 658 N.E.2d at 909. We find that there is substantial evidence of probative value to support a factfinder's determination that M.T.V. and B.E. formed an agreement to inflict injury on J.R., during a school shooting to be carried out on April 20, 2018, that would create a substantial risk of J.R.'s death. Accordingly, there is sufficient evidence to support the true finding.

# Conclusion

[25] The trial court did not abuse its discretion in admitting Facebook conversations containing statements made by M.T.V. and his coconspirator, and the evidence is sufficient to support the delinquency adjudication.

[26] Affirmed.

Najam, J., and May, J., concur.