

**FILED**

Jul 06 2017, 8:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Terrance L. Richardson, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | July 6, 2017 <br><br> Court of Appeals Case No. <br> 49A02-1701-CR-17 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Mark D. Stoner, Judge <br><br> Trial Court Cause No. <br> 49G06-1510-MR-35635 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Terrance L. Richardson (Richardson), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1.

We affirm.

# ISSUES

Richardson raises two issues for our review, which we restate as:

(1) Whether the trial court abused its discretion when it excluded a Facebook message from the evidence presented at trial; and

(2) Whether the State presented sufficient evidence beyond a reasonable doubt to rebut Richardson's claim of self-defense.

# FACTS[1] AND PROCEDURAL HISTORY

On the afternoon of October 4, 2015, Richardson, and his three friends, Jalen Heffner (Heffner), Kaylend Gilbert (Gilbert), and Steven Kendall (Kendall)—all approximately seventeen years old—walked together to the New York Express convenience store, located at 2801 East New York Street—on the corner of Rural Street and New York Street—in Indianapolis, Indiana. Richardson and Gilbert entered the store, while Heffner and Kendall waited outside. After a

---

[1] The facts are partially derived from the various security cameras outside and inside the convenience store, as well as from a remodeling business one door south of the store. These security cameras captured images only and did not register sound.

short while, Kendall walked around the corner of the store, while Heffner sat on the curb in front of the store's entrance. A couple of seconds after Kendall walked around the corner, Richardson exited the store and joined Heffner on the curb; Gilbert remained inside, waiting in line at the cash register. When his purchase was complete, Gilbert joined Richardson and Heffner at the curb, just as Kendall turned the corner and walked towards them.

[5] About a minute later, the group turned their attention to Rural Street as a black car pulled up. Richardson, Heffner, and Gilbert moved toward the vehicle and leaned into the passenger side window to start conversing with the occupant. Kendall hung back, remaining on the curb. Eventually, Kendall walked towards the vehicle and appeared to speak with the occupant. Then, Richardson, Gilbert, and Kendall moved away and began talking amongst themselves on the curb; Heffner remained at the vehicle. During the conversation, Kendall lifted his shirt with both hands and showed the other two a black item—appearing to be a gun—in the waistband of his pants. A couple of seconds later, Heffner shook hands with the occupant of the vehicle, which then drove away. All four talked briefly in front of the store, before walking away. Approximately thirty seconds later, Heffner and Richardson returned to the store. Upon entering, they immediately walked toward the back where Heffner reached in his right-hand pocket and handed Richardson a black object, which Richardson quickly pocketed in his jacket. The two then exited the store without making a purchase.

[6] The four boys walked together to the parking lot behind the convenience store. Behind the store, Kendall stopped first. Richardson turned and walked back to Kendall, leaning down briefly with his hands on his knees. Richardson then faced Kendall and put his hand in his jacket. Heffner faced Kendall at the opposite side of Richardson. Richardson pulled out a gun and abruptly lunged at Kendall. Kendall put his left hand out to ward off the attack, and Richardson fired a single shot into Kendall's chest.

[7] Heffner immediately sprinted back to the front parking lot of the New York Express. Richardson and Gilbert ran into each other as they fled towards Rural Street, causing Gilbert to drop his cellphone. Richardson, Gilbert, and Heffner met up after crossing the street and started walking as if nothing had happened. Although shot, Kendall managed to run in the opposite direction. As he ran, he dropped his gun. Seconds after he picked up the gun, he collapsed on the sidewalk and died.

[8] When law enforcement arrived, they discovered Kendall face-first on the concrete, showing no signs of life. They recovered a handgun a few feet from Kendall's body. The handgun was fully loaded but did not have a bullet in the chamber. Forensic testing of the firearm revealed that it was not the weapon that had fired the fatal shot. A cellphone was recovered from Kendall's body. Another cellphone, later determined to belong to Gilbert, was found in the parking lot where Richardson and Gilbert had bumped into each other as they fled. Police officers obtained the surveillance footage from the New York

Express and from the remodeling business, which allowed the officers to quickly identify the individuals involved.

[9] On October 5, 2015, the State filed an Information charging Richardson with murder, a felony. On November 14 through 16, 2016, the trial court conducted a joint bench trial for Richardson, Heffner, and Gilbert.[2] At the close of the evidence, the trial court found Richardson guilty as charged, but found Gilbert and Heffner not guilty. On December 1, 2016, the trial court sentenced Richardson to fifty-five years executed in the Indiana Department of Correction.

[10] Richardson now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I. *Admission of Evidence*

[11] Richardson contends that the trial court abused its discretion when it excluded a Facebook message between Kendall and a third party from the evidence admitted at trial. The trial court has inherent discretionary power over the admission of evidence, and its decisions are reviewed only for an abuse of that discretion. *Bowman v. State*, 73 N.E.3d 731, 734 (Ind. Ct. App. 2017), *trans. denied*. Accordingly, we will reverse the trial court's decision only when it is

---

[2] All three defendants were charged with murder, but only Richardson was found guilty. The trial court did not find sufficient evidence to prove beyond a reasonable doubt that Heffner and Gilbert were knowing accomplices in Kendall's murder.

clearly against the facts and circumstances before the court. *Id.* Even if the trial court abused its discretion in admitting evidence, the judgment will be undisturbed if the decision to admit evidence is harmless error. *Id.* "Harmless error occurs 'when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction.'" *Id.* (quoting *Lafayette v. State*, 917 N.E.2d 660, 666 (Ind. 2009)).

[12] During his case-in-chief, Kendall called Detective Grant Melton of the Indianapolis Metropolitan Police Department (Detective Melton). Detective Melton testified about his examination of the password-protected cellphone that had been recovered from Kendall's body. During his examination, Detective Melton retrieved a Facebook profile under the name "Bandman Trapp." (Transcript Vol. III, p. 63). Through Facebook's Messenger application, Detective Melton discovered a conversation between Bandman Trapp and another account with the name "Little L Mike Brookside" from a couple days prior to the shooting. (Tr. Vol. III, p. 64). Richardson moved to admit the message and the State objected on grounds of improper foundation, relevance, and hearsay.

[13] After the trial court expressed concerns about the evidentiary foundation of the message, Richardson questioned Detective Melton about the author of the message and the recovery of the data during follow-up questioning. Upon being interrogated by the State, Detective Melton noted that the Facebook account could not only be accessed through the cellphone that was recovered at

the scene, but could also be accessed through any computer or any other telephone. "Other than [] having seen Bandman Trapp on that message," Detective Melton had "no idea who made that statement or who composed that message." (Tr. Vol. III, p. 72). He clarified that he did not know who composed the message because anyone could sign into that account on a computer and compose the message which "would then sync to that phone if it's signed into the account." (Tr. Vol. III, p. 72). After the trial court denied the admission of the message based on foundation grounds, Richardson made an offer to prove. In his offer to prove, Richardson indicated that the exhibit would show that on October 1, 2015, Kendall, under his Facebook account of Bandman Trapp, messaged Little L Mike Brookside, "Nah I'm boutta finesse hoodie for this strap but I need you[,]" which Richardson represented to mean, "I'm about to rob somebody for a black gun." (Tr. Vol. III, pp. 83, 84).

[14]     "To lay a foundation for the admission of evidence, the proponent of the evidence must show that it has been authenticated." *Hape v. State*, 903 N.E.2d 977, 989 (Ind. Ct. App. 2009), *trans. denied*. Indiana Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Absolute proof of authenticity is not required. *M.T.V. v. State*, 66 N.E.3d 960, 963 (Ind. Ct. App. 2016), *trans. denied*. Rather, the proponent of the evidence must establish only a reasonable probability that the evidence is what it is claimed to be, and may use direct or circumstantial evidence to do so. *Pavlovich v. State*, 6 N.E.3d 969, 976

(Ind. Ct. App. 2014), *trans. denied*. Once this reasonable probability is shown, any inconclusiveness of the evidence's connection with the events at issue goes to evidential weight, not admissibility. *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*.

[15] "Letters and words set down by electronic recording and other forms of data compilation are included within Rule 901(a)." *Wilson v. State*. 30 N.E.3d 1264, 1268 (Ind. Ct. App. 2015), *trans. denied*. Moreover, Evidence Rule 901(b) provides a non-exhaustive list of evidence that satisfies the authentication requirement. One example is where there is evidence describing a process or system and showing that it produces an accurate result. Evid. R. 901(b)(9). Another example, provided in Evidence Rule 901(b)(4), is where, taken together with all the circumstances, the evidence has distinctive characteristics in appearance, contents, or substance. Federal Rule of Evidence 901(b)(4) uses language identical to that of Indiana Rule of Evidence 901(b)(4). "We have previously acknowledged that federal courts have recognized Federal Rule of Evidence 901(B)(4) as one of the most frequently used means to authenticate electronic data, including text messages and emails." *Wilson*, 30 N.E.3d at 1268.

[16] In *Wilson*, we addressed whether messages sent through a Twitter social media account were properly authenticated as having been authored by the defendant. *Id*. at 1268. During trial, a witness testified that she often communicated with Wilson on Twitter and had general knowledge of the account by its "@Nell_FearNoMan" header. *Id*. at 1268-69. The contents of the account

included pictures depicting Wilson holding guns that matched the description of those used in the crime. *Id*. at 1269. Moreover, there was testimony that Wilson was affiliated with two gangs, and the @Nell_FearNoMan Twitter account frequently used terms referring to those gangs, showing that the author of the messages was affiliated with them. *Id*. We concluded that "taken together, the witness testimony identifying the Twitter account as belonging to Wilson and the content posted on the account, including pictures and gang references, are more than sufficient to authenticate the Twitter posts as being authored by Wilson." *Id*.

[17] In *M.T.V.*, M.T.V. admitted, in an interview with law enforcement officers, to having had Facebook conversations with B.E., in which B.E. threatened to shoot up the school on April 20, 2018. *M.T.V.*, 66 N.E.3d at 963-64. The Facebook records introduced at the hearing contained the content M.T.V. admitted to. *Id*. at 964. Furthermore, in addition to having distinctive characteristics in content, the Facebook records were also supported by an affidavit from Facebook's authorized records custodian, which specified, *inter alia*, that the records were made and kept by Facebook's automated systems and were made at or near the time the Facebook user transmitted the information. *Id*. At the hearing, law enforcement testified that the procedure used to obtain the Facebook records was an ordinary procedure, previously used for criminal investigations involving Facebook. *Id*. Concluding that, collectively, the State had established the requisite reasonable probability that the Facebook records corresponded to M.T.V.'s and B.E.'s accounts and that M.T.V. and B.E.

authored the conversations therein, we found the records properly authenticated. *Id.*

[18]　Here, Detective Melton described the procedure used to unlock the password-protected cellphone and after opening up the Facebook application, he located an account under the name of Bandman Trapp. Upon preliminary questioning by the State, Detective Melton explained that there are several ways a Facebook account could be accessed. He clarified that anyone who signed into the Facebook account, through a computer or cellphone, could compose messages that would then sync to the Facebook application on the recovered cellphone. In other words, Detective Melton had "no idea who made that statement or who composed that message." (Tr. Vol. III, p. 72). Unlike the defendants in *Wilson* and *M.T.V.*, Richardson did not present any evidence describing distinctive characteristics that could connect the particular statement to Kendall, nor did he present any other indicia of reliability establishing Kendall as the author of the contested statement. Accordingly, the trial court did not abuse its discretion when it refused to admit the Facebook message.

## II. *Self-Defense*

[19]　Next, Richardson contends that the State failed to present sufficient evidence beyond a reasonable doubt to rebut his claim of self-defense. The standard for reviewing a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same standard used for any claim of insufficient evidence. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002). We neither reweigh the evidence nor

judge the credibility of witnesses. *Id.* If there is sufficient evidence of probative value to support the conclusion of the trier of fact, the judgment will not be disturbed. *Id.*

[20] "A valid claim of self-defense is a legal justification for an otherwise criminal act." *Henson v. State*, 786 N.E.2d 274, 277 (Ind. 2003). To prevail on his self-defense claim, Richardson must show that he: (1) was in a place where he had a right to be; (2) acted without fault; and (3) was in reasonable fear of apprehension of bodily harm. I.C. § 35-41-3-2; *Henson v. State*, 786 N.E.2d 274, 277 (Ind. 2003). A person who provokes, instigates, or participates willingly in the violence does not act without fault for the purposes of self-defense. *Shoultz v. State*, 995 N.E.2d 647, 660 (Ind. Ct. App. 2013), *trans. denied*. A mutual combatant, whether or not the initial aggressor, must declare an armistice before he may claim self-defense. *Wilson*, 770 N.E.2d at 801.

[21] When self-defense is raised and finds support in the evidence, the State bears the burden of negating at least one of the necessary elements. *Id.* at 800. The State may meet this burden by offering evidence directly rebutting the defense, by affirmatively showing that the defendant did not act in self-defense, or by relying on the sufficiency of the evidence from its case-in-chief. *Miller v. State*, 720 N.E.2d at 696, 700 (Ind. 1999). If a defendant is convicted despite his self-defense claims, we will reverse only if no reasonable person could say that self-defense was negated beyond a reasonable doubt. *Wilson*, 700 N.E.2d at 801.

[22]   Richardson's claim of self-defense rested entirely on Gilbert's testimony and the surveillance video of the incident. He presented a theory that he shot Kendall in response to Kendall grabbing a gun from his waistband and clicking the trigger, which failed to fire because there was no bullet in the chamber. Upon rendering its guilty judgment, the trial court discussed Richardson's self-defense claim as follows:

> The [c]ourt finds that first at looking at this, and as I indicated, I looked at this, the tapes for about four hours last night and I looked at, again, reviewed two critical parts of the tape, one the part of the shooting, the second, the part of the grocery store and whether or not there was a handoff of a weapon or not. Those to me were the two critical points at issue. . . . The [c]ourt does not believe that this was self-defense. It believes the State's case in chief proved beyond a reasonable doubt, one, that [Richardson] did fire the shot and did knowingly killed [Kendall], two, that it was not a matter of self-defense. The film does not show the decedent in this case attacking anyone, raising his hands or doing anything, even if he had his hand on the gun outside. [Gilbert] is simply not credible on this point. [Gilbert's] testimony indicates he was standing not near—that he was merely watching and not doing anything, the tape is pretty clear to the [c]ourt that once [Richardson] shoots [Kendall], everybody is moving and everybody is moving quickly. And so the [c]ourt doesn't find him credible on that point and does find the tape to be pretty clear, that the [three defendants] fled the area, they did not return to the area in terms of a self-defense claim, in the common language of things, they didn't stand their ground, wait for the police and tell them that it was a justified shooting. They didn't do anything to aid [Kendall]. And, again, this is someone, according to [Gilbert], they were all friends and had no beef against each other and that they all got along . . . This was a deliberate shooting. It was a deliberate killing.

(Tr. Vol. III, pp. 99-101).

[23] On appeal, Richardson urges us to re-interpret the images captured by the surveillance video to find that Kendall made a movement "which could have been a reach for his loaded weapon" immediately before Richardson pointed a gun and shot Kendall. (Appellant's Br. p. 20). He also argues that the trial court "could not properly consider Gilbert's testimony, and any lack of his credibility, as evidence against Richardson." (Appellant's Br. p. 17). However, as there were no eyewitnesses to the killing and Gilbert was the only defendant testifying, Richardson relied on Gilbert's version of the facts in addition to his interpretation of the surveillance video to bolster his claim of self-defense. In fact, during closing argument, Richardson compared Gilbert's testimony and the images captured on the surveillance tapes almost side-by-side, noting that "Gilbert got up there and told the truth." (Tr. Vol. III, p. 93). If any error existed in the trial court's consideration of Gilbert's testimony when weighing its judgment against Richardson, it was invited by Richardson and he cannot now be heard to complain. In other words, Richardson's entire argument is an invitation to reweigh the evidence displayed on the surveillance video and Gilbert's credibility. We decline to accept his invitation. *See Wilson*, 770 N.E.2d at 801.

## CONCLUSION

[24] Based on the foregoing, we hold that the trial court properly excluded a Facebook message from the evidence at trial; and the State presented sufficient evidence beyond a reasonable doubt to rebut Richardson's claim of self-defense.

Affirmed.

Najam, J. and Bradford, J. concur