# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 07 2020, 9:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nancy A. McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Supervising Deputy Attorney
General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of T.M., Jr.,<br>*Appellant-Respondent,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Petitioner.* | February 7, 2020<br><br>Court of Appeals Case No.<br>19A-JV-1979<br><br>Appeal from the Elkhart Circuit<br>Court, Juvenile Division<br><br>The Honorable Michael A.<br>Christofeno, Judge<br><br>The Honorable Deborah A.<br>Domine, Magistrate<br><br>Trial Court Cause Nos.<br>20C01-1904-JD-81, 20C01-1904-<br>JD-104 |

**Altice, Judge.**

# Case Summary

T.M., Jr., appeals his adjudications on two counts of criminal recklessness and two counts of dangerous possession of a firearm, all of which would constitute criminal offenses if committed by an adult. T.M. argues that the adjudications must be set aside because the juvenile court improperly admitted a Facebook post and a witness's testimony into evidence, the evidence was insufficient to support the adjudications, double jeopardy principles barred adjudications on all four counts, and the juvenile court abused its discretion in placing him in the Indiana Department of Correction (DOC).

We affirm.

# Facts and Procedural History

On March 23, 2019, T.D. saw seventeen-year-old T.M. standing across the street from T.D.'s Elkhart residence. T.D. noticed that T.M. was constantly "peeking and looking [around]." *Transcript Vol. II* at 67. On prior occasions, T.D. observed T.M. instigate fist fights with others. T.D. had "friended" T.M. on Facebook so he could "keep tabs" on T.M. and stay out of his way. *Id.* at 61-62. T.M. referred to himself as "Nocap Savo" on his Facebook page. *Id.* "Savo" was also T.M.'s street name. *Id.* at 51.

T.D. was concerned about T.M.'s presence, so he rounded up his younger siblings and took them inside. Shortly after completing this task, T.D. noticed a vehicle approach his house. Two individuals got out of the car, and T.D. identified one of them as T.M. Both T.M. and the other individual "shot at"

T.D. "four times." *Id.* at 69, 73. T.M. then ran to his nearby residence and the shooting stopped.

[5] The next day, T.D. was in his bedroom and noticed a truck in front of his house. The back passenger window was rolled down, and T.D. saw T.M. holding a gun. T.M. fired the gun in his direction, and T.D. immediately jumped to the floor and heard three more gunshots. T.D.'s mother also heard the shots, and one of her sons ran inside the house and identified T.M. as the shooter. T.D.'s mother contacted the police, and an Elkhart Police officer was dispatched to the residence. The officer photographed two fresh bullet holes in the siding of T.M.'s house.

[6] On April 9, 2019, the State filed a delinquency petition under cause number 20C01-1904-JD-81 (JD-81), which alleged that on March 24, 2019, T.M. had committed what would be Level 5 felony criminal recklessness and Class A misdemeanor dangerous possession of a firearm, if T.M. were an adult. That same day, the State filed a delinquency petition under cause number 20C01-1904-JD-104 (JD-104), alleging that on March 23, 2019, T.M. had committed what would be Level 6 felony criminal recklessness and Class A misdemeanor dangerous possession of a firearm, if T.M. were an adult. The cases were consolidated, and an evidentiary hearing was held on April 29, 2019.

[7] At the hearing, the juvenile court admitted over T.M.'s hearsay objection, testimony by L.D.—T.D.'s mother—that T.D. had told her sometime prior to these incidents that T.M. had "shown him a gun" because the two of them had

been arguing and "beefing" over a girl. *Transcript Vol.* II at 121. The court also admitted, over objection, screenshots of posts from T.M.'s Facebook page that T.D. had obtained. One of the posts stated, "You rock with the opps then you gone die w em." *Exhibits Vol. IV* at 11. T.M. argued that the posts were irrelevant and were not properly authenticated because the Facebook page had been removed prior to the hearing.

[8] Following the hearing, the juvenile court entered true findings on all four offenses and adjudicated T.M. a delinquent child. On July 15, 2019, the juvenile court adopted the probation department's recommendation that T.M. be made a ward of the DOC because of his behavior and the number of prior adjudications that he had amassed. In so doing, the juvenile court rejected the mental health evaluators' recommendations that T.M. be placed with his mother or father and receive outpatient services including individual and family therapy and assistance in understanding instructions. The juvenile court determined that it was in the community's and T.M.'s best interest to be removed from his home because he continually placed himself in high risk situations and showed no remorse for his actions. T.M. now appeals.

## Discussion and Decision

### *I. Admission of Evidence*

[9] T.M. argues that the screenshots of the Facebook page should not have been admitted into evidence because there was no way to authenticate them as the Facebook page had been deleted. T.M. also claims that L.D.'s testimony about

what her son had told her about T.M.'s possession of a gun should have been excluded because it was hearsay and irrelevant.

[10] In general, the trial court has inherent discretionary power as to the admission of evidence, and its decisions are reversed only when there has been an abuse of discretion. *Lewis v. State*, 34 N.E.3d 240, 247 (Ind. 2015). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court. *Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012).

[11] As for T.M.'s contention that the trial court erred in allowing the screenshots of the Facebook page into evidence, we note that the proponent of the evidence must show that it has been authenticated. *Hape v. State*, 903 N.E.2d 977, 989 (Ind. Ct. App. 2009), *trans. denied*. Indiana Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Absolute proof of authenticity is not required. *M.T.V. v. State*, 66 N.E.3d 960, 963 (Ind. Ct. App. 2016), *trans. denied*. Rather, the proponent of the evidence must establish only a reasonable probability that the evidence is what it is claimed to be and may use direct or circumstantial evidence to do so. *Richardson v. State*, 79 N.E.3d 958, 962 (Ind. Ct. App. 2017), *trans. denied*. Evidence that establishes a reasonable probability that the document is what it is claimed to be constitutes sufficient authentication or identification. *Id.* Indiana Evidence Rule 901 also sets forth a variety of ways that will satisfy the authentication requirement. These include

"testimony that an item is what it is claimed to be, by a witness with knowledge, as well as "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Evid. R. 901(b)(1), (b)(4). Once a reasonable probability has been established, "any inconclusiveness of the evidence's connection with the events at issue" goes to the weight of the evidence. *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*.

[12] When the State offered the Facebook page posts into evidence, T.D. had already testified that he had sent a friend request to T.M. on Facebook, that T.M. accepted the request, and that T.M. referred to himself as "Nocap Savo" on Facebook. *Transcript Vol. II* at 61-62. T.D. indicated he used Facebook to "keep tabs" on T.M., so he could try to stay out of T.M.'s way. *Transcript Vol. II* at 61-62. T.D. also testified that "everybody" knew that the "Nocap Savo" Facebook page was T.M.'s. *Id.* at 88. T.D. also testified that he knew the "Nocap Savo" Facebook page was T.M.'s because T.M. "goes live on Facebook[1] and you can see all of that," and he had viewed some of those videos. *Id.* at 90-91.

[13] T.M. claims that T.D. "never added" T.M. as a friend on Facebook. *Id*. at 88. However, T.D. testified that he and T.M. had become Facebook friends during the school year. Thus, in the portion of T.D's testimony upon which T.M.

---

[1] Facebook Live is a feature of that social network that uses the camera on a computer or mobile device to broadcast real-time video to Facebook. *See* Facebook.com

relies, where T.D. stated that he had been aware of T.M.'s Facebook page but "I just never added him as a friend[,]" the juvenile court could reasonably infer that T.D. meant he had not added T.M. as a Facebook friend *before* the point in the school year in which he sent a friend request to T.M.

[14] Furthermore, in *Wilson v. State*, 30 N.E.3d 1264 (Ind. Ct. App. 2015), *trans. denied*, this court found that "the witness testimony identifying the Twitter account as belonging to [the defendant] and the content posted on the account, including pictures and gang references, are more than sufficient to authenticate the Twitter posts as being authored by [the defendant]." *Id*. at 1269. Similarly, when considering T.D.'s testimony that the Nocap Savo Facebook page was T.M.'s and that T.D. watched T.M.'s Facebook "live" videos, the juvenile court properly exercised its discretion in determining that there was an adequate basis to find that the posts were authored by T.M.

[15] T.M. next argues that the trial court erred in admitting L.D.'s testimony where she commented that T.D. told her that T.M. had "shown him a gun" prior to the incident. *Transcript Vol. II* at 121. T.M. does not assert how he may have been harmed by the admission of this evidence. Moreover, even assuming that such testimony was irrelevant or amounted to hearsay evidence, errors in the admission of evidence are to be disregarded unless they affect the substantial rights of a party. *Hoglund v. State*, 962 N.E.2d 1230, 1238 (Ind. 2012). The juvenile court did not mention the above testimony in its findings. Rather, it determined that T.M. had committed the acts by relying on the testimony concerning T.M.'s actions on March 23 and 24. Thus, we conclude that any

error in the admission of this evidence was harmless at best, and T.M. is not entitled to a reversal of his adjudications on this basis.

## II. Sufficiency of the Evidence

T.M. next argues that the evidence was insufficient to support the adjudications. T.M. claims that the State failed to establish beyond a reasonable doubt that he was the shooter in either incident or that he possessed a handgun.

A true finding "must be based upon proof beyond a reasonable doubt." Ind. Code § 31-37-14-1. When reviewing a challenge to the sufficiency of the evidence supporting a true finding, we do not reweigh the evidence or judge the credibility of witnesses. *B.T.E. v. State*, 108 N.E.3d 322, 326 (Ind. 2018). Rather, this court will consider only the evidence favorable to the judgment and the reasonable inferences supporting it. *Id.* The juvenile court's judgment will be affirmed as long as there is substantial evidence of probative value from which a reasonable fact finder could conclude beyond a reasonable doubt that the juvenile engaged in the unlawful conduct. *Stephenson v. State*, 29 N.E.3d 111, 114 (Ind. 2015).

Indiana Code section 35-47-10-5(a) provides that a "child who knowingly, intentionally, or recklessly possesses a firearm for any purpose . . . commits dangerous possession of a firearm, a Class A misdemeanor." The delinquency petitions alleged that T.M. knowingly possessed a firearm on March 23, 2019, and March 24, 2019, and that on both occasions he was seventeen years old.

As for the counts of criminal recklessness, the State was required, under the delinquency petition filed in cause number JD-104, to prove that on March 23, 2019, T.M. recklessly, knowingly, or intentionally *performed an act* which created a substantial risk of bodily injury to T.D., and that T.M. was armed with a deadly weapon. I.C. § 35-42-2-2(a), (b)(1)(A) (emphasis added). The delinquency petition filed under cause number JD-81 required the State to prove that on March 24, 2019, T.M. recklessly performed an act that created a substantial risk of bodily injury to T.D. "by shooting a firearm into an inhabited dwelling or other building or place where people were likely to gather." *Appendix Vol. II* at 35.

[19]   T.M.'s sole sufficiency challenge is the alleged lack of evidence identifying him as the assailant. However, T.D. testified at the fact-finding hearing that T.M was the shooter on both occasions. As for the incident that occurred on March 23, 2019, T.D. testified that he saw T.M. standing across the street "in the back" of a nearby house and "there was peeking and looking." *Transcript Vol. II* at 67. At some point, a vehicle approached the front of T.D.'s residence, and two individuals got out of the car and ran toward T.D. T.D. positively identified one of the individuals as T.M. T.M. and the other individual "shot at" T.D. "four times." *Id.* at 69, 73. Because T.D. identified T.M. as one of the individuals who was "running up and shooting[,]" the juvenile court as the factfinder could reasonably conclude that there was sufficient evidence to establish T.M.'s identity with regard to the March 23, 2019 incident. *See Goolsby v. State*, 517 N.E.2d 54, 58 (Ind. 1987) (holding that there was sufficient

evidence establishing the defendant's identity when the victim was able to observe the defendant's profile in adequate lighting several times during an attack, knew his voice, and identified the defendant at trial).

[20] As to the March 24 incident, T.D. testified that he was looking out his bedroom window and saw a truck nearby. The rear passenger window was rolled down, and T.D. observed T.M. in the truck holding a gun. T.D. saw the gun fire once and he jumped to the floor before hearing three more gunshots. J.J., another individual who was present at the scene, testified that when the shooting occurred, he was not able to positively identify the shooter, but he did notice that the shooter was wearing the same type of hat that T.M. typically wore and that the shooter's hat was "cocked to the left" in the same manner that he had seen T.M. wear his hat. *Transcript Vol. II* at 169.

[21] Based on T.D.'s testimony that identified T.M. as the shooter during the March 24, 2019, incident and J.J.'s corroborating testimony, the trial court could reasonably conclude that T.M. was the individual in the truck who fired the gun at T.D.'s residence. *See Bailey v. State*, 979 N.E.2d 133, 136 (Ind. 2012) (holding that the uncorroborated testimony of a single witness, including the victim, is sufficient to support a conviction); *see also Goolsby*, 517 N.E.2d at 58.

[22] Nonetheless, T.M. alleges that the adjudications cannot stand because there were inconsistencies in T.D.'s testimony. We find that the alleged inconsistencies were, at best, a few minor contradictions, and "[i]t is the function of a trier of fact to judge the victim's credibility in part on those

inconsistent statements[.]" *Smith v. State*, 779 N.E.2d 111, 115 (Ind. Ct. App. 2002), *trans. denied*; *see also Reed v. State*, 748 N.E.2d 381, 396-97 (Ind. 2001) (concluding that the evidence was sufficient to support the defendant's conviction for felony murder where the only witness to place the defendant at the scene of the crime and identify him as the triggerman "was not a model witness," some of his testimony was "improbable," and "he was impeached by a number of prior inconsistent statements"); *Cohen v. State*, 714 N.E.2d 1168, 1179 (Ind. 1999) (although a witness gave conflicting testimony, it was the responsibility of the factfinder to resolve these conflicts and to decide what to believe and disbelieve), *trans. denied.*

[23] In sum, the essence of T.M's arguments are requests for this Court to reweigh the evidence. We decline that invitation and conclude that the evidence was sufficient to support T.M.'s adjudications.

### III. Double Jeopardy

[24] T.M. next claims that both adjudications for criminal recklessness and the two adjudications for possessing a handgun violate double jeopardy principles and cannot stand. T.M. alleges the same evidence was used to support the two separate adjudications "on each of the two days" that the offenses were committed. *Appellant's Brief* at 34. Thus, T.M. maintains that he is being punished twice for the same offense.

[25] Article 1, Section 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." Two offenses are the same

offense for double jeopardy purposes if, "with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State,* 717 N.E.2d 32, 49 (Ind. 1999). The Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense. *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002).

[26] Under the actual evidence test, "the actual evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts." *Id.* at 53. To find a double jeopardy violation under this test, we must conclude that there is "a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense. *Id.*

[27] A reasonable possibility requires substantially more than a logical possibility, and turns on a practical assessment of whether the factfinder may have latched on to exactly the same facts for both convictions. *Garrett v. State,* 992 N.E.2d 710, 719-20. We evaluate the evidence from the fact finder's perspective and may consider the charging information, jury instructions, and arguments of counsel. *Id.* at 720. Whether multiple convictions violate double jeopardy is a question of law, which this Court reviews *de novo*. *Black v. State*, 79 N.E.3d 965, 975 (Ind Ct. App. 2017), *trans. denied.*

[28] T.M. claims that he should have been adjudicated a delinquent for only one offense committed each day and relies upon the "actual evidence test" for that proposition. *Appellant's Brief* at 22. We reject that contention, in that the evidence establishes that it was one delinquent act for T.M. to bring a firearm to T.D.'s house and it was another delinquent act for T.M. to actually fire the weapon. Unlike the offense of criminal recklessness, the dangerous possession of a firearm offense did *not* require evidence that T.M. had fired the weapon. *See* I.C. § 35-47-10-5. Thus, because T.M. committed the separate acts of dangerous possession of a firearm and criminal recklessness on both March 23 and March 24, 2019, we conclude that his adjudications did not violate the double jeopardy provision of the Indiana Constitution. *See, e.g.*, *Mickens v. State*, 742 N.E.2d 927, 931 (Ind. 2001) (convictions for carrying a handgun without a license and murder did not violate double jeopardy because carrying the gun along the street was one crime and killing a person was another); *see also Ho v. State*, 725 N.E.2d 988, 992-93 (Ind. Ct. App. 2000) (concluding that robbery and carrying a handgun without a license convictions did not violate double jeopardy principles because the defendant failed to establish that the same evidentiary facts may have been used to prove the elements of each challenged offense). As our Supreme Court commented in *Mickens*, "[t]his seems about right. Carrying the gun . . . was one crime and using it was another." 742 N.E.2d at 931.

Accordingly, T.M.'s argument that double jeopardy concerns were violated because "each day's offenses were based on the same incident of criminal conduct and were proven by the same evidence," fails. *Appellant's Brief* at 22.

## IV. T.M.'s Placement in the DOC

T.M. next claims that the juvenile court abused its discretion in placing him with the DOC. T.M. argues that the DOC was not the least restrictive alternative and that placing him in the DOC went against the mental health evaluators' recommendations.

The specific disposition of a delinquent child is within the juvenile court's discretion to be guided by the following considerations: the safety of the community, the best interests of the child, the least restrictive alternative, family autonomy and life, freedom of the child, and the freedom and participation of the parent, guardian, or custodian. *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006) (citing Ind. Code § 31-34-19-6). The juvenile court's decision will be reversed only for an abuse of discretion, which is a decision that is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

Because of competing priorities in the juvenile system, including supporting family life, promoting individual accountability and promoting public safety, the juvenile court is given the discretion to determine what is in the juvenile's best interest. *See K.A. v. State*, 775 N.E.2d 382, 387-88 (Ind. Ct. App. 2002) (citing Ind. Code § 31-10-2-1), *trans. denied*. In certain situations, the best

interest of the child is better served by a more restrictive placement. *D.B. v. State*, 842 N.E.2d 399, 406 (Ind. Ct. App. 2006).

[33] In this case, the juvenile court observed that in addition to the charged offenses, T.M. had committed other delinquent acts, including battery resulting in serious bodily injury. In light of T.M.'s repeated acts of violence, including the use of a firearm on multiple occasions, it was within the juvenile court's discretion to determine that commitment to the DOC, where counseling and educational programs were to continue, served everyone's best interests. *See K.S.*, 849 N.E.2d at 544.

[34] Additionally, T.M.'s actions in this case were inherently dangerous and presented an extremely high risk of death to others. T.M.'s behavior indicated a need for rehabilitation in a much more secure environment before he reached the age where his delinquent behavior would be considered criminal. Because of T.M.'s repeated acts of violence, it was not inappropriate for the juvenile court to place T.M. in a secure facility to give him a more structured opportunity to learn how to modify his behavior and develop life skills.

[35] As this court has pointed out, confinement may be one of the most effective rehabilitative techniques available in some instances. *Id.* Moreover, a "delinquent child's first exposure to the consequences he will face should he continue to break the law may indeed be the best treatment available in helping a young person readjust his values and priorities in life." *B.K.C. v. State*, 781 N.E.2d 1157, 1172 (Ind. Ct. App. 2003). In our view, the juvenile court's

decision to commit T.M. to the DOC was consistent with the safety of the community and the "best interest of the child." *See* I.C. § 31-37-18-6; *see also S.C. v. State*, 779 N.E.2d 937, 940 (Ind. Ct. App. 2002)(observing that the commitment to the DOC ensured that the juvenile would receive, "in a secure environment, the extended rehabilitative counseling that she needs to address her mental health and substance abuse issues"), *trans. denied.*

[36] Judgment affirmed.

Robb, J. and Bradford, C.J., concur.