


FILED

Dec 20 2024, 9:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Marcus Jayon Anderson,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

December 20, 2024

Court of Appeals Case No.
23A-CR-1645

Appeal from the Marion Superior Court

The Honorable Shatrese M. Flowers, Judge

Trial Court Cause No.
49D28-2012-MR-36110

**Opinion by Judge Kenworthy**
Judges May and Vaidik concur.

**Kenworthy, Judge.**

## Case Summary

[1] In the aftermath of George Floyd's death while in Minneapolis police custody in May 2020, there were protests and demonstrations in downtown Indianapolis. As day turned to night on Saturday, May 30, the situation downtown deteriorated—vandalism occurred, fires were set, and gunshots rang out. Between 11:20 p.m. and 11:40 p.m., several crimes were committed within a two-block area north of Monument Circle and east of the Indiana War Memorial.[1] The State charged Marcus Anderson, Alijah Jones, and Nakeyah Shields with the crimes. The three defendants had a joint jury trial.

[2] The jury found Anderson guilty of murder,[2] felony murder,[3] six counts of Level 3 felony armed robbery,[4] and two counts of Level 3 felony attempted armed robbery.[5] The trial court vacated the murder conviction due to double jeopardy

---

[1] The majority of the crimes occurred in the 400 block of Talbott Street. Talbott Street is between Pennsylvania and Delaware Streets, all north-south streets. The 400 block is north of Vermont Street and south of Michigan Street. Talbott Street is sometimes referred to in the record as "the alley."

[2] Ind. Code § 35-42-1-1(1) (2018).

[3] I.C. § 35-42-1-1(2).

[4] I.C. § 35-42-5-1(a)(1) (2017).

[5] I.C. §§ 35-42-5-1(a)(1) and 35-41-5-1 (2014).

concerns and ordered Anderson to serve an aggregate sentence of 164 years on the remaining counts. Anderson appeals his convictions and sentence, raising the following issues:

> 1) Did the trial court err in allowing the State to add two counts of robbery days before the jury trial?

> 2) Did the trial court err in denying his request for extra voir dire time?

> 3) Did the trial court err in admitting social media evidence?

> 4) Is Anderson's 164-year sentence inappropriate when considering the nature of his crimes and his character?

[3] We affirm.

## Facts and Procedural History

### The Crimes[6]

[4] Anderson, Jones, and Shields were with Dorian Murrell and another man[7] downtown the night of May 30. Murrell was Jones' brother and Shields' boyfriend. Anderson, Shields, and Murrell arrived together in Murrell's car and parked near Vermont and Talbott Streets. Anderson's and Shields' cell phones

---

[6] For a more detailed recitation of the crimes, see the opinion in Jones' separate appeal, also handed down on this date. *Jones v. State*, Cause No. 23A-CR-1644 (Ind. Ct. App. December 20, 2024); *see also Shields v. State*, Cause No. 23A-CR-1645 (Ind. Ct. App. December 20, 2024).

[7] The State alleged this fifth person was involved in the crimes but was not able to identify him.

were used in that general area between 11 p.m. and midnight. A car matching the description of Jones' car was also parked near Vermont and Talbott Streets that night.

[5] Around 11:20 p.m., Amy Zandy parked on the first floor of a parking garage at Vermont and Delaware Streets adjacent to her apartment building. While Zandy was still in her car, she saw several people walking into the garage. One was a woman wearing a brightly colored jacket who Zandy felt "was with that group but was a little bit removed[.]" *Tr. Vol. 5* at 194. The group approached her car and a man in a ski mask holding a gun knocked on the window and told Zandy to give him her keys. When Zandy opened the driver's side door to comply, all the doors unlocked. Multiple people entered the car and rummaged through Zandy's things.

[6] The person who entered the front passenger side pulled Zandy down onto the center console by the collar of her shirt and held her there while the man with the gun repeated his demand for her keys. Zandy told them where the keys were and to "[t]ake whatever you want." *Tr. Vol. 5* at 181. Most of the group left, taking Zandy's cellphone, wallet, and makeup bag, but leaving her keys. The man in the passenger seat remained, and he and Zandy "just star[ed] at each other long enough" that Zandy finally said, "I don't know what to do right now." *Id.* at 182. The man said, "[I]t's okay baby girl," and got out of the car. *Id.* at 185. The group walked north on Delaware Street from the parking garage toward Michigan Street. Zandy left the parking garage to drive to a friend's

house and waved down a police officer about a block away from the garage to make a brief report.

[7] Kimberly Eggers went to Monument Circle to meet up with friends but could not find them and left the area because it was "pretty crazy." *Tr. Vol. 4* at 28. She started walking north and called a friend to come pick her up. On Michigan Street between Pennsylvania and Delaware Streets, Eggers turned around when she heard someone behind her say, "[H]ey." *Id.* at 32. Four men Eggers did not know surrounded her and one hit her in the face. One man took her cellphone out of her hand, and another took her backpack. A man with dreadlocks hit her again and she fell to the ground, losing her glasses. The men kicked her several times before walking west on Michigan Street toward a man on a bike and a person in a bright jacket. Eggers called out, asking them to give her things back. The man with the dreadlocks turned around, and Eggers saw what she thought was a crowbar in his hand. She then ran the other way. Surveillance video obtained from a nearby building showed the robbery occurred around 11:30 p.m.

[8] Sofia Fuentes and Saige Mitchell decided to leave downtown when they "started to see things getting broken into." *Tr. Vol. 4* at 209. While they tried to find their way back to their car, Fuentes was live streaming on Instagram. When Fuentes and Mitchell were near Zandy's parking garage, they heard— and the video captured the sound of—gunshots. They "freak[ed] out," headed in another direction, and ended up on Vermont Street near Talbott Street. *Id.* at 210.

[9] Around this same time, Jared Sarr, Byron Morris, Alejandro Thompson, and Abbey Bell parked in a lot on Talbott Street behind an apartment building to visit Sarr's friend. Thompson noticed four men approaching and Sarr shouted at everyone to run.

[10] Sarr ran into the apartment building, but Morris, Thompson, and Bell were thrown to the ground and told to empty their pockets. Two men started kicking Thompson while another man "was in a tussle" with Bell over her cellphone. *Tr. Vol. 4* at 86. The man tussling with Bell fired a shot into the ground near Bell when she could not remember her Apple ID. Morris was also being yelled at to enter his Apple ID into his phone. Bell said her attacker was wearing all black and a ski mask. Morris recalled one of the men wearing a COVID-style facemask, a red baseball cap, and a black sweatshirt; a second man had dreadlocks and was wearing a facemask and a white t-shirt. Bell and Morris saw two firearms among the men.[8]

[11] Fuentes and Mitchell "stumbled upon [the] robbery going on" on Talbott Street. *Tr. Vol. 4* at 210. They saw three or four masked men standing over "a bunch of people that were on the ground, and one of them had a gun." *Tr. Vol. 5* at 205. The man with the gun was wearing a white shirt and had dreadlocks. He yelled to Fuentes and Mitchell to get down and waved the gun toward the ground. The men went through their pockets after they laid on the pavement

---

[8] Thompson did not testify at trial.

face down, and someone fired a shot near Mitchell's head. The men ran north toward Michigan Street when they saw police lights in the distance. Bell grabbed her cell phone back as the men started running, but the men took Morris' cellphone, wallet, and electric cigarette vape; Thompson's cellphone and wallet; and Fuentes' backpack with Mitchell's car keys in it. They took nothing from Mitchell personally. Morris estimated the robbery lasted three to five minutes.

[12] Sarr came out of the apartment building and summoned Morris, Thompson, and Bell inside. Fuentes and Mitchell ran south toward Vermont Street. Fuentes called 9-1-1 to report the robbery. As Fuentes and Mitchell stood at the corner of Pennsylvania and Vermont Streets, they heard two or three gunshots in the area they had come from. Sarr, Morris, and Bell also heard gunshots shortly after entering the apartment building.

[13] Soon after hearing the gunshots, Fuentes and Mitchell saw an ambulance and police cars head toward Talbott Street and decided to go back and tell police they had just been robbed, thinking it might be "a part of whatever had just happened." *Tr. Vol. 4* at 217. Returning to Talbott Street "[m]aybe seven minutes" after they left, they saw someone face down on the ground who had not been there before. *Id.* at 218.

[14] Christopher Beaty lived in the Colonial Apartments at the corner of Delaware and Vermont Streets. At 11:35 p.m., Beaty sent a Snapchat message—his last outgoing message that day. At 11:36 p.m., Beaty left his apartment through the

Delaware Street entrance and turned right, walking toward Vermont Street. He was holding his cellphone in his hand. Shields was standing on Vermont Street, and as Beaty walked by, he told her to be safe. Shields said shortly after that interaction she heard gunshots come from Talbott Street and ran. The body Fuentes and Mitchell saw lying face down when they returned to Talbott Street was Beaty's. He had been shot multiple times.

[15] Hearing about the property damage occurring downtown, Kiran Sunkara went to check on his office. Finding no damage, Sunkara left the office about 11:10 p.m. and walked to his car, parked in the 400 block of Talbott Street facing north with Vermont Street immediately behind. He left his backpack in the car and then walked to a nearby mailbox to mail a check. The walk to the mailbox from his car took seven to ten minutes. Sunkara returned to his car, buckled up, and locked his doors. Within a few seconds, two men came from behind toward his car. One man—wearing a dark-colored shirt—approached the driver's side and told Sunkara to get out. The other man—wearing a light-colored shirt—approached the passenger side and pointed a gun, telling Sunkara to get out of the car and tapping the gun on the windshield. Sunkara reversed his car quickly onto Vermont Street and sped away. As he was reversing, a shot was fired at his car. He did not see anyone else in the alley during this incident. Sunkara did not immediately contact police.

**The Investigation**

[16] Detective Stephen Smalley of the Indianapolis Metropolitan Police Department ("IMPD") was the lead investigator of the Beaty murder. He responded to the

call of a person down in the 400 block of Talbott Street at about 11:40 p.m. on May 30. He found Beaty face down on the street, head pointed south. No surveillance cameras covered this block and there were no eyewitnesses to the shooting. Fuentes, Mitchell, Morris, Thompson, and Bell had remained nearby and spoke with investigators at the scene. Bell provided her cell phone for testing because one of the perpetrators had grabbed it.

[17] Crime scene specialist Kaylee Schellhaass responded to the scene in the early morning hours of May 31. Schellhaass collected two bullet casings from the street. She also found Beaty's black iPhone north of his body. She collected swabs from Beaty's and Bell's phones. Schellhaass returned to the 400 block of Talbott Street on June 1 and collected three additional casings reported by a passerby.

[18] A little over two hours after Beaty's body was found, Murrell was shot at Monument Circle in an unrelated incident. Murrell was taken to Eskenazi Hospital where he died from his injuries. Anderson, Jones, and Shields were with Murrell when he was shot and made their way to the hospital. Detectives investigating the Murrell shooting spoke with Jones at the hospital and noticed a man wearing a brightly colored jacket who identified himself as "Marcus."

[19] On the afternoon of May 31, David Munoz contacted police. Around noon on May 30, he had parked his car on the first floor of the same garage where Zandy was robbed. When he returned to his car the next day, the driver's side window was shattered. Munoz started to clean his car but stopped when he

found a bullet among the debris. Officers recovered the bullet and a casing from the car. On June 1, Sunkara contacted police after reading about Beaty's death. Police recovered a bullet from the passenger-side engine compartment of Sunkara's car.

[20] Dr. Christopher Poulos, chief forensic pathologist at the Marion County Coroner's Office, examined Beaty's body. He identified four gunshot wounds to the back of Beaty's body and recovered bullets from two of the wounds. Beaty's body also showed evidence of blunt force injuries. Dr. Poulos acknowledged these injuries "could be explained by a fall after being shot" but believed it was "more probable than not that they were the result of a physical altercation." *Tr. Vol. 4* at 23–24. He explained, "[W]hen we have a fall . . . I expect to see [injuries] in one plane, [but] in this case, we have more than one area." *Id.* at 24. Dr. Poulos determined Beaty's cause of death was multiple gunshot wounds and his manner of death was homicide.

[21] Timothy Spears, a forensic firearms examiner, examined the five casings recovered from Talbott Street, the two bullets recovered from Beaty's body, the bullet and casing found in Munoz's car, and the bullet recovered from Sunkara's car. Detective Spears determined all the casings came from the same firearm and all the bullets came from the same firearm.[9] A firearm associated with these crimes was never recovered.

---

[9] Detective Spears could not conclusively say the casings *and* bullets all came from the same firearm.

[22]   Detective Ted Brink was assigned to investigate the Zandy robbery. Detective Brink spoke with Zandy on June 1, and later obtained high-quality surveillance video from the parking garage. The video shows five people—a woman and four men—walking into the parking garage and approaching Zandy's car. They are all wearing surgical gloves and the men are each wearing some sort of face covering. The woman—later identified as Shields—is wearing a jacket with bright red, yellow, blue, and green blocks of color. One man—later identified as Murrell—is wearing a red baseball hat and Tommy Hilfiger sweatshirt; another man—later identified as Anderson—has shoulder-length dreadlocks and is wearing jeans and a white t-shirt with a graphic on it. Both Murrell and Anderson are wearing medical face masks. Another man—later identified as Jones—is wearing a dark long-sleeved shirt, black pants with white stripes down the side, black shoes with a white sole, and a ski mask. The fifth unidentified person is wearing a Champion sweatshirt and has something wrapped around the bottom half of his face.

[23]   The video shows all five initially passing by the car and then the four men returning and robbing Zandy. Murrell passes something to Jones, who then knocks on the driver's side window and shows a gun. Murrell opens the driver's door, leans in and pulls items out; Jones opens the back driver's side door and pulls additional items out. Anderson fully enters the front passenger side of the car and stays for about forty-five seconds. After comparing the Zandy robbery video to reports, pictures, and videos from other crimes and

events that occurred on May 30, Detective Brink contacted Detective Smalley to say he believed their investigations were related.

[24] Police created "be-on-the-lookout" fliers ("BOLOs") containing still photos taken from the video, information about the time and date of the offense, and contact information. The BOLOs were released to the media on June 4. Several people contacted IMPD after seeing the BOLOs. Among them, Fuentes and Morris each told Detective Smalley the suspects depicted were the same people who robbed them on Talbott Street. Eggers also saw the BOLOs and recognized the individuals depicted as the men who attacked her, but she did not report the crime against her until 2022. Latanya Lewis—who had known Jones since he was in junior high school—saw the BOLOs and reported Jones as one of the suspects. Officers investigating Murrell's death recognized the clothing on one of the suspects as matching what Murrell was wearing at the time he was shot.

[25] Armed with the Zandy robbery video, surveillance video from various buildings around the area, Fuentes' livestream video, and tips from the BOLOs, among other things, Detective Smalley managed to identify four of the suspects as Anderson, Jones, Shields, and Murrell and follow their movements around Vermont and Talbott Streets on May 30. Detectives then gathered additional evidence, including video of cars matching the description of Murrell's and Jones' cars parked near Vermont and Talbott Streets during the incidents, the subjects' cell phone location data, and articles of clothing collected during a

search of Jones' apartment.[10]  In addition, Zandy identified Anderson from a photo array Detective Brink presented to her as the person in the passenger seat who held her down during the robbery.

[26]  Detective Smalley searched the suspects' social media accounts and got a search warrant for records from their Facebook accounts.  His review of those records revealed several private message conversations seemingly discussing the crimes.  On June 2, 2020, Anderson sent Jones a message asking if he could stay with him and get rides to and from work.  Jones replied, "That ain't no good idea you need to be hiding out and sh*t from the other night . . . .  Aye you need to lay low get out of town or something I just seen the report from that dude. . . .  Ima send it to you but you gotta delete our whole message thread and all that sh*t." *Ex. Vol. 1* at 193–94.  Anderson asked, "What dude," and Jones replied, "N**** from the alley." *Id.* at 194.  On June 4, Anderson sent Shields a message stating, "Aye somebody wanna buy that gun.  Ask bro do he wanna sell it." *Id.* at 190.  Shields responded, "Don't talk like that on my phone. . . .  I don't know what you talking about." *Id.*  Anderson replied, "My bad u right." *Id.*  On June 10, Anderson sent a message to an individual named Sanders stating, "I need to move down there. Tbh I'm in a lil trouble up here and I def need to get tf lost." *Id.* at 198.  They also shared screenshots of the

---

[10] When the swabs Schellhaass collected from Beaty's and Bell's phones were tested for DNA, Anderson, Jones, Shields, and Murrell were excluded as contributors of DNA recovered from the phones.

BOLOs and a social media post and news stories about Beaty's murder with each other.

[27] Shields and Anderson both spoke with Detective Smalley. Both admitted being downtown on May 30 in the company of Murrell. Shields said she was "at the end of the alley where Chris Beaty was murdered . . . standing there by a car talking to [Murrell]." *Tr. Vol. 6* at 9. Beaty walked by, smoking a blunt. Shields commented the blunt "seemed nice" and Beaty told her to "be safe out tonight because it's crazy out." *Id*. Shortly after, Shields heard a gunshot and ran. Anderson said he walked through a parking garage and "interacted with someone" that night. *Id.* at 12. Shields and Anderson were unable to leave downtown because the location where their car was parked was "blocked off by police and crime scene tech." *Id.* at 10. They were both with Murrell when he was shot and went to the hospital to be with him.

**Pretrial Proceedings**

[28] In August 2020, the State charged Anderson with Level 3 felony armed robbery and Level 3 felony criminal confinement arising out of the Zandy robbery (the "Zandy case"). Jones was charged on the same date with crimes related to the Zandy robbery.

[29] In December 2020, the State charged Anderson by information with one count of murder, one count of felony murder, four counts of armed robbery related to Bell, Morris, Thompson, and Fuentes; two counts of attempted armed robbery

related to Mitchell and Sunkara; and one count of pointing a firearm[11] at Thompson (the "MR case"). The State requested and was granted a no contact order prohibiting Anderson from contacting the victims and witnesses, including Zandy. In June 2021, Jones and Shields were indicted by a grand jury for crimes committed on May 30, 2020.[12] Jones' and Shields' cases were set for jury trial alongside Anderson's.

[30] At a January 2022 pretrial conference, the MR case was continued as to all three defendants, and Anderson requested the Zandy case "track the [MR] case" and be continued as well. *Tr. Vol. 2* at 8. And in multiple written motions to continue filed with both the Zandy and MR case numbers, Anderson noted the Zandy case was "tracking the MR cause." *See Appellant's App. Vol. 2* at 103, 136.

[31] In August 2022, the State moved to join for trial the Zandy case and the MR case, alleging the charges "are all part of a single scheme or plan and are a series of connected acts." *Appellant's App. Vol. 2* at 158. The trial court held a hearing at which the State explained:

---

[11] The trial court ultimately granted a motion for judgment on the evidence as to the pointing a firearm charge and it was not submitted to the jury.

[12] Jones was charged with felony murder, four counts of Level 3 felony armed robbery (for allegedly taking property from Morris, Thompson, Bell, and Fuentes), and two counts of Level 3 felony attempted armed robbery (for allegedly attempting to take property from Mitchell and Sunkara). Shields was charged with felony murder, five counts of Level 3 felony armed robbery (for allegedly taking property from Morris, Thompson, Bell, Fuentes, and Zandy) and one count of Level 3 felony attempted armed robbery (for allegedly attempting to take property from Mitchell).

[All charges] stem from multiple robberies that occurred in the downtown area within a 25- to 30-minute span, starting from the first robbery to the final. Additionally, they all occur within a one block radius. . . . [I]t's essentially the same case, the same evidence, and all of these cases are intertwined with one another, with the same witnesses. And so for efficiency, we would ask that the . . . cases be joined.

*Tr. Vol. 2* at 18. Anderson objected:

I understand the State's argument that . . . the substance of these allegations do all occur within a very close[] geographic area as well as a very close time period.

* * *

[In] bringing this case together and trying all of these robberies together, essentially the State would be asking a jury to make a propensity argument of well, we have evidence of all these other robberies, we have evidence of all these things that were happening, so therefore that makes it more likely that [Anderson] committed a murder because there were other incidents that were happening at the same time.

*Id.* at 20. The trial court took the matter under advisement.[13]

[32] In the summer of 2022, Eggers contacted police to report she had been robbed on May 30, 2020. The State had known of the Eggers robbery for some time because it was visible on surveillance video but did not know Eggers' identity.

---

[13] The State filed the same motion with respect to Jones' two cases, and Jones also objected.

Once Eggers made a report, the State disclosed her identity to the defendants, and Anderson took Eggers' deposition in the fall of 2022. On May 9, 2023—with trial set to begin on May 22—the State moved to amend Anderson's charges in the MR case to add a count of Level 3 felony robbery related to the Eggers robbery (the "Eggers count").[14]

[33] At a pretrial conference on May 10, 2023, the trial court denied the State's request to join the Zandy case and confirmed Anderson was set to be tried on the MR case jointly with Jones and Shields beginning May 22. On May 17, the State amended its motion to amend, still seeking to add the Eggers count and now also seeking to add a count of Level 3 felony armed robbery related to the Zandy robbery (the "Zandy count").[15] The trial court considered this motion at the final pretrial conference on May 18.

[34] Anderson objected to the amendment with respect to the Zandy count because the court had denied the motion to join the Zandy case and the motion to amend "is essentially the same request[.]" *Tr. Vol. 2* at 74. He objected to the amendment with respect to the Eggers count for several reasons. One, he believed Eggers' identification of him after she had reviewed the probable cause affidavit and media coverage was "problematic" and "would not be admissible." *Id.* Two, the addition of the count was "just for the basis of

---

[14] The State also moved to add a count related to the Eggers robbery to Jones' and Shields' cases.

[15] The State also moved to add a count related to the Zandy robbery to Jones' case.

propensity[.]" *Id.* And three, the motion to amend was "very belated[.]" *Id.* Even though he had deposed Eggers, he was "not given formal notice of the charging decision until . . . about a week ago." *Id.*

[35] The State responded that Anderson had known of the State's intention to try the Zandy and MR cases together since its August 2022 motion to join. The State also noted Shields was already charged with robbery of Zandy and "it would be confusing for the jury . . . to hear evidence about this particular charge but only be permitted to deliberate on it with regard to [Shields]." *Id.* at 75. As for the Eggers count, the State emphasized the crime had been detailed in the probable cause affidavit even though Eggers' identity was unknown at the time Anderson was charged. Her identity was immediately shared with the defense when the State learned of it and Anderson deposed her, so "they have had informal notice, if not formal notice." *Id.* at 77.

[36] The trial court granted the motion and allowed the State to add the Eggers and Zandy counts.[16] Anderson did not request a continuance. The trial court later granted the State's motion to dismiss the Zandy case.

---

[16] Anderson filed a motion in limine seeking to limit any reference to the Zandy and Eggers robberies, among other things. Following the trial court's grant of the State's motion to amend, Anderson noted this request was moot. *See Tr. Vol. 2* at 115. Anderson did make a continuing objection at trial to all evidence regarding the Zandy charge. *See Tr. Vol. 3* at 241–42.

**The Trial**

[37] The joint jury trial began on May 22, 2023.  Before calling the prospective jurors into the courtroom, the trial court reviewed the jury selection procedure:

> [T]he Court will allow each side for the first round to be 30 minutes.  Each side will have 30 minutes for the first round.
>
> For the second round, each side will have 20 minutes, just so you all know.  Each side will have 20 minutes.  I do challenges for cause at the end of each round.  I anticipate that we likely will have to voir dire people individually at the bench.
>
> . . . I will seat 18 for each round.  Each round will have 18.  We will fill up the jury box.

*Tr. Vol. 3* at 6.  Each side had twelve peremptory challenges.

[38] For the first round of questioning, Jurors #1 through #9 were seated in the front row of the jury box and Jurors #10 through #18 were seated in the back row.  The State used its thirty minutes, followed by Anderson's, Jones', and then Shields' counsel, each with ten minutes.  With less than two minutes of Shields' time remaining, Shields' counsel asked, "[I]f . . . Defendant does not take the stand, raise your hand if you think that they're guilty, and that's why they're not going to take the stand?"  *Tr. Vol. 3* at 90.  The record reflects two unidentified jurors commented, and then time was called.  Anderson's counsel immediately asked to approach the bench, and counsel and the court had the following conversation:

[Anderson's counsel]: Judge, I was just asking, based on that last question, seeing as how literally the entire back row raised their hands, we would have additional time to question them for cause.

The Court: No, you may not.

[Anderson's counsel]: Okay, I – just for the record, I think that the defense would benefit from having more opportunity to question those particular jurors for cause, as most of them indicated that they did want to hear from our clients . . . .

The Court: But I think we make a statement that – and they'll be given instructions.

*Id.* at 91–92. Jurors #3, 5, 9, 14, 15, and 18 from this first panel were seated on the jury.

[39]     Over twenty witnesses testified at trial. Zandy testified about the robbery, acknowledged she had selected Anderson from a photo array, and identified him in court, albeit reluctantly. Zandy said she was "certain in [her] answer," but "it was a very uncomfortable question for [her]" because she felt bad "for literally everybody involved." *Tr. Vol. 5* at 201. The State introduced more than 150 exhibits, including certified business records from Facebook of communications involving Anderson, Jones, and Shields. Detective Smalley explained the process of filing a preservation request, obtaining a search warrant, and reviewing the records produced. When the State offered the Facebook records, Anderson objected, claiming the records had not been sufficiently authenticated. The trial court admitted the records over objection.

[40]     The jury found Anderson guilty of all charges.[17]

### Sentencing

[41]     The presentence investigation report prepared for Anderson's sentencing reflects he has no known juvenile record, but four arrests as an adult, with one felony conviction for robbery resulting in bodily injury and one misdemeanor conviction for domestic battery. Anderson was incarcerated from July 2018 to January 2020 on the felony conviction and then released to probation. He was on probation at the time of these offenses. While in Marion County Jail in this case, Anderson had two reported incidents, including assault. After being moved to the Indiana Department of Correction ("DOC"), he had two conduct incidents. Anderson provided a sentencing memorandum to the trial court, proffering the following mitigating factors: Anderson has a history of childhood trauma; he has mental health diagnoses and untreated substance use disorder; his age at the time of the offense; and his character and attitudes suggest he is unlikely to commit another crime.

[42]     Eggers testified at the sentencing hearing, explaining the significant impact the incident had on her, but also expressing her forgiveness and requesting a sentence that is "fair, yet not harsh, because I believe . . . grace is what bears the

---

[17] Jones was found guilty of felony murder, six counts of Level 3 felony armed robbery (Morris, Thompson, Bell, Fuentes, Zandy, and Eggers), and two counts of Level 3 felony attempted armed robbery (Mitchell and Sunkara). He was sentenced to 164 years.

Shields was found guilty of felony murder, six counts of Level 3 felony armed robbery (Morris, Thompson, Bell, Fuentes, Zandy, and Eggers), and one count of Level 3 attempted armed robbery (Mitchell). She was sentenced to 108 years.

most fruit, and that's the seed that I want to plant." *Tr. Vol. 8* at 18. Two of Beaty's friends and his sister testified about Beaty and the impact of his life and death.

[43] Carolyn Vance, a licensed clinical social worker from the Public Defender Agency, spoke on Anderson's behalf, explaining her interactions with him and her research into his background. Vance prepared Anderson's sentencing memorandum. She explained that "our brain develops properly between ages 25 and 28." *Tr. Vol. 8* at 37. Anderson was twenty-two at the time of these crimes, and "for somebody who is that age and experienced the kind of trauma [he] had experienced in his life, impulsivity, things like that, are kind of at the forefront of a brain that is not fully developed." *Id.* at 38.

[44] The State highlighted the "trail of victims" from this "crime spree" that occurred in "just 15 minutes," arguing Anderson, Jones, and Shields "took advantage of the situation that was going [on] downtown that night." *Id.* at 67. The State asked for Anderson to be sentenced to 172 years.

[45] Anderson's counsel asked the court to consider his preexisting mental health diagnoses and untreated substance use disorder, as well as his history of childhood trauma in "strik[ing] a balance between the mitigators in his particular case with the statutory aggravators that the State has brought up[.]" *Id.* at 73. Counsel also noted the State's focus on the proximity in time of these offenses and—acknowledging the crimes are crimes of violence—asked the court to consider "looking at each instance as . . . parts of one episode as

opposed to individual instances" and running "either instances concurrently, or particular victims concurrently[.]" *Id.* at 74.

[46] The trial court considered as a mitigator Anderson's childhood trauma of living in extreme poverty and losing his mother at a young age. The court also found his mental health diagnoses and untreated substance use disorder to be mitigators. The trial court found as aggravators Anderson's criminal history and that he was on probation when he committed these offenses. The court also considered the nature and circumstances of the crimes to be an aggravator—specifically, the crimes of violence against multiple victims. And the court noted Anderson's risk to reoffend was high.

[47] The trial court vacated the jury's guilty verdict for the murder charge and sentenced Anderson to sixty years for felony murder and thirteen years for each robbery and attempted robbery conviction. The court ordered the sentences to be served consecutively, for a total sentence of 164 years in the DOC.

[48] Anderson appeals his convictions and sentence. Additional facts will be added as necessary.

## 1. Anderson waived any objection to amending the charges against him, but waiver notwithstanding, there was no error in allowing the amendment.

[49] Anderson claims the trial court erred by granting the State's motion to amend the information to add the Eggers and Zandy counts. He argues the amendment was a "prodigious change" that prejudiced his substantial rights.

*Appellant's Br.* at 39. He also anticipates a waiver argument from the State because he did not request a continuance after the trial court allowed the amendment. But he argues waiver should not apply because he should not have to choose between requesting a continuance to prepare for the new charges and having a trial that had already been delayed for over two years from its original setting.

[50] As Anderson predicted, the State argues he waived this claim. Our Supreme Court has held that once a defendant's objection to a pre-trial substantive amendment has been overruled, he must request a continuance or the issue is waived. *Haymaker v. State*, 667 N.E.2d 1113, 1114 (Ind. 1996); *see Gaby v. State*, 949 N.E.2d 870, 874 (Ind. Ct. App. 2011). Anderson urges us not to follow this precedent, citing *State v. McFarland* as a case where this Court "examined the filing of a late amendment without regard to whether the defendant could have requested a continuance." *Appellant's Br.* at 39 (citing 134 N.E.3d 1027, 1029 (Ind. Ct. App. 2019), *trans. denied*). In *McFarland*, the trial court *denied* a late proposed amendment. The State appealed, arguing in part there would have been no prejudice to the defendant by allowing the amendment because on request, the trial court would have been obligated to continue the trial. 134 N.E.3d at 1030. Although the *McFarland* court discussed the requirement of requesting a continuance, it did not face a defendant's waiver. *McFarland* is procedurally distinguishable from this case. We decline Anderson's request to ignore Supreme Court precedent and instead, we abide by the long-standing

rule of waiver. Anderson did not request a continuance and has waived this issue for appellate review.

[51] Waiver notwithstanding, Anderson would not prevail. An amendment to the charging information may be either a matter of form or substance. *See Erkins v. State*, 13 N.E.3d 400, 405 (Ind. 2014). An amendment is one of substance "only if it is essential to making a valid charge of the crime." *Id*. at 406 (quoting *Fajardo v. State*, 859 N.E.2d 1201, 1205 (Ind. 2007)). An amendment that adds a new count "is patently one of substance as charg[ing] the commission of a separate crime . . . is unquestionably essential to making a valid charge of the crime." *Mays v. State*, 120 N.E.3d 1070, 1080 (Ind. Ct. App. 2019) (internal quotation omitted), *trans. denied.*

[52] An indictment or information may be amended in matters of substance "upon giving written notice to the defendant at any time . . . before the commencement of trial . . . if the amendment does not prejudice the substantial rights of the defendant." I.C. § 35-34-1-5(b)(2) (2014). A defendant's substantial rights "include a right to sufficient notice and an opportunity to be heard regarding the charge; and, if the amendment does not affect any particular defense or change the positions of either of the parties, it does not violate these rights." *Erkins*, 13 N.E.3d at 405 (quoting *Gomez v. State,* 907 N.E.2d 607, 611 (Ind. Ct. App. 2009), *trans. denied*). "Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges." *Taylor v. State*, 86 N.E.3d 157, 163 (Ind. 2017) (quotation omitted), *cert. denied*.

[53] Anderson's substantial rights were not prejudiced by the amendment. Although Anderson does not complain about lack of notice or opportunity to be heard, we note Anderson had both. Anderson was charged in the Zandy case in August 2020. After the MR case was filed in December 2020, Anderson requested the two cases "track" each other even before the State filed its motion to join in August 2022. Then the State's motion to join remained pending for nine months. The trial court denied the motion to join on May 10, 2023—two weeks before trial was set to begin. By that time, Jones had deposed Zandy and Detective Brink in preparation for the Zandy case.

[54] As for the Eggers count, at the time of the charges in the MR case, the State knew about the Eggers robbery but did not know Eggers' identity. The robbery was included in the probable cause affidavit—filed December 3, 2020, alongside the charges against Anderson—as committed against an "unknown person." *Appellant's App. Vol. 2* at 43–44. When Eggers reported the crime to police in June 2022, the State promptly informed Anderson. The trial court held a hearing on the State's motion to amend, at which the State said it had "conversations" with the defense, so they "had informal notice, if not formal notice" of the State's intent to add the Eggers count. *Tr. Vol. 2* at 77. The State also informed the court Anderson had already deposed Eggers. The amendments formalized what Anderson had notice of for several months. *See Mays*, 120 N.E.3d at 1080–81 (State's amendment of charges about two months before trial in a case pending for two years did not prejudice the

defendant because he knew the amendment likely would occur and the amendment did not change his defense).

[55] Anderson asserts the amendment permitted the State to present otherwise irrelevant and inadmissible evidence—the "entirety of Eggers's and Zandy's testimony[.]" *Appellant's Br.* at 38. Anderson claims the "evidence against him was dramatically increased" by the amendment, but he does not argue how the amendment affected any particular defense or changed the parties' positions. *Id.*; *see Taylor*, 86 N.E.3d at 163 (holding trial court did not err in permitting amendment two days before trial when the defendant, among other things, did not explain how the amendment hindered his defense). With the original charges in the MR case, the State was alleging a close-in-time series of robberies accomplished by escalating force.[18] The amendment did not change that theory. And Anderson's defense in the MR case was that the State had not "put together the puzzle pieces" to prove he was part of the group robbing people around Vermont and Talbott Streets that night. *Tr. Vol. 7* at 110. That defense applied equally before and after the amendment.

[56] Anderson had a reasonable opportunity to prepare for and defend against the added counts. The trial court did not err in allowing the amendment.

---

[18] Pending the trial court's ruling on the motion to amend, the State filed a notice of intent to introduce evidence of the Zandy and Eggers robberies, requesting the trial court "admit the proposed evidence as intrinsic evidence related to the charged offenses or in the alternative as permissible evidence under Indiana Rule of Evidence 404(b) to show motive, intent, opportunity, identi[t]y, or plan." *Appellant's App. Vol. 2* at 229.

## 2. Anderson was not denied a fair trial by the trial court's denial of extra time to conduct voir dire.

[57] Anderson claims his right to a fair and impartial jury was compromised because the trial court denied his request for more time to question the first venire panel. He asserts good cause existed for allowing extra time because some jurors in the first panel signaled they would view a defendant's silence at trial as a sign of guilt, contrary to the constitutional right to remain silent. This, he says, "cut[s] at the very heart of Anderson's right to a fair trial." *Appellant's Br.* at 27.

[58] The Indiana Constitution grants a criminal defendant the right to trial by an impartial jury. Ind. Const. art. 1 § 13(a). "The function of the voir dire is to ascertain whether or not the prospective juror can render a fair and impartial verdict in accordance with the law and the evidence." *Murphy v. State*, 469 N.E.2d 750, 752 (Ind. 1984). Trial courts have broad discretion to regulate the form and substance of voir dire but must adhere to our Trial Rules. *Doroszko v. State*, 201 N.E.3d 1151, 1154–55 (Ind. 2023). Indiana Trial Rule 47(D) addresses the examination of prospective jurors.[19] During voir dire, the court must afford each party a reasonable opportunity to exercise its peremptory challenges intelligently through inquiry. *Perryman v. State*, 830 N.E.2d 1005, 1008 (Ind. Ct. App. 2005) (citing *Von Almen v. State,* 496 N.E.2d 55, 59 (Ind.

---

[19] Trial Rule 47 is made applicable to this criminal case through Indiana Criminal Rule 21 (now Criminal Rule 1.1, effective January 1, 2024), which states the Indiana Rules of Court and all statutes governing procedure and practice in trial courts apply to all criminal proceedings unless they conflict with the Criminal Rules.

1986)). In part, Rule 47(D) allows the court to "impose an advance time limitation" on examination of the jurors by the parties or their attorneys. But it also directs that when the time expires, "the court shall liberally grant additional reasonable time upon a showing of good cause related to the nature of the case, the quantity of prospective jurors examined and juror vacancies remaining, and the manner and content of the inquiries and responses given by the prospective jurors." T.R. 47(D). The decisions of the trial court regarding voir dire will be reversed only if there is a showing of manifest abuse of discretion and the denial of a fair trial. *Cliver v. State*, 666 N.E.2d 59, 65 (Ind. 1996). "This will usually require a showing by the defendant that he was in some way prejudiced by the voir dire." *Id.*

[59] The following discussion was held in the last few minutes of the defendants' time to question the first venire panel:

> [Counsel]: . . . [I]s there anybody who would want to hear from somebody arrested? Do you want them to take the stand and hear their version? Raise your hand?
>
> Prospective Juror: It would be nice.
>
> Prospective Juror: I don't know what you mean.
>
> [Counsel]: Do you understand that they don't have to take the stand? They have that protection? Do – and what are some reasons someone may not take . . . the stand? Yes?

Prospective Juror: I don't really know why, but I've heard that sometimes . . . they can often be advised not to do so. And I'm not really sure why that is, but –

[Counsel]: Why, please?

Prospective Juror: Some people just aren't great getting in front of people, and they don't project the best. I don't know if I would in a situation like that, you know. And . . . [t]hey might not be very eloquent, or they might not, you know, project.

[Counsel]: . . . [I]f Ms. Shields, or Defendant does not take the stand, raise your hand if you think that they're guilty, and that's why they're not going to take the stand?

Prospective Juror: It doesn't necessarily automatically mean they're guilty. I don't know. It seems questionable, a little, I would say.

[Counsel]: So you don't think you could be fair or impartial if they did not take the stand?

Prospective Juror: I honestly don't . . . know.

[Counsel]: . . . Ms. S., what do you think?

Prospective Juror: I understand why some people might want . . .

The Court: Time.

Prospective Juror: . . . to defend themselves, but I think it could be helpful sometimes, because it can help them more humanize themselves. . . . [B]ecause sometimes when you are sitting there

and you're being tried, people sometimes admit – like might automatically assume he's guilty. But being able to speak for yourself could help.

*Tr. Vol. 3* at 89–91. The trial court denied Anderson's request for more time to question this round of prospective jurors. The record of jury selection is unclear about who raised their hand in response to counsel's question or who commented further. But taking at face value Anderson's counsel's statement that "literally the entire back row raised their hands," three of those prospective jurors were seated.[20] *Tr. Vol. 3* at 91.

[60] It is troubling that any prospective jurors revealed—at least preliminarily—they would look unfavorably on a defendant who did not testify. Because of these responses, Anderson did show good cause for the "liberal[] grant [of] additional reasonable time" to question the panel further about their views. T.R. 47(D). But once the court did not grant additional time, Anderson did nothing he could or should have done to cure or preserve the error.

[61] Anderson did not ask to make a more specific record of which prospective jurors had raised their hands and which had elaborated on their views for purposes of appeal. The record does not reflect the defendants challenged any of the nine jurors from the back row for cause because of their answers to the

---

[20] In his opening brief, Anderson asserts six of the jurors from the back row were seated but concedes in his reply brief it was three. *See Appellant's Reply Br.* at 7 n.1. "But whether half or a quarter of Anderson's jury believed he was guilty because he chose not to testify," Anderson argues "the consequence of an unfair trial remains the same." *Id.*

question about a defendant not taking the stand. Anderson seems to concede the defendants did not make a for-cause challenge to any of the jurors but claims such a challenge would have been futile. Anderson cites *Curtis v. State* for the proposition that "[c]ounsel cannot be faulted for failing to make an objection which had no hope of success[.]" *Appellant's Reply Br.* at 8 (quoting 905 N.E.2d 410, 418 (Ind. Ct. App. 2009), *trans. denied*). But *Curtis* was decided in the context of a post-conviction proceeding alleging ineffective assistance of counsel for failure to object to admissible evidence and is not directly applicable to this situation. Moreover, just because the trial court denied additional time for questioning does not necessarily mean the court also would have denied a for-cause challenge to a juror for expressing a viewpoint contradicting a defendant's right not to testify at trial. Regardless, Anderson did not give the trial court the opportunity to rule on a for-cause challenge. The defendants also did not exercise any of their twelve peremptory challenges after the first round of questioning. *See Appellant's Br.* at 23. And the record reflects the defense still had at least one peremptory challenge remaining when all jurors were seated. *See Tr. Vol. 3* at 160 (trial court saying to the State when choosing alternate jurors, "You haven't used yours as much as the Defense has. They've used 11.").

[62] The exhaustion requirement is fatal to Anderson's claim. The exhaustion rule promotes judicial economy by requiring parties to "use the tools at their disposal to cure error and avoid significant costs that will accrue to the judiciary, the parties, and the citizen jurors." *Oswalt v. State*, 19 N.E.3d 241,

246 (Ind. 2014). Under this rule, a defendant must use any available peremptory challenges to correct erroneous denials of challenges for cause. *Id.* Our Supreme Court has explained that if a defendant proves both erroneous denial of a for-cause challenge and inability to strike another objectionable juror because his peremptories were exhausted, he is "entitled to a new trial, full stop." *Merritt v. Evansville-Vanderburgh Sch. Corp.*, 765 N.E.2d 1232, 1237 (Ind. 2002). Although we are not directly reviewing the denial of a for-cause challenge, the policies and purposes behind the exhaustion requirement also apply in this situation. Anderson did not make for-cause challenges to the allegedly biased jurors and he did not exhaust his peremptories. In other words, Anderson did not use the tools at his disposal to cure the trial court's error at the time and "ensure a fair trial and an efficient resolution of the case." *Id.* at 1235. Having failed to do so, Anderson cannot now show he was denied a fair trial by the trial court's conduct of voir dire. *See Cliver*, 666 N.E.2d at 65.[21]

## 3. The trial court did not abuse its discretion in admitting Facebook messages.

[63]     Anderson claims the trial court erred by admitting private Facebook messenger conversations that were not properly authenticated. Three sets of exhibits were introduced: one set with messages obtained from Jones' account, one with

---

[21] The trial court's final instructions instructed the jury: "No defendant may be compelled to testify. A defendant has no obligation to testify. The defendants did not testify. You must not consider this in any way." *Tr. Vol. 7* at 181. We presume jurors follow their instructions. *Weisheit v. State*, 109 N.E.3d 978, 989 (Ind. 2018), *cert. denied*.

messages from Anderson's account, and one with messages from Shields' account. Anderson does not challenge the admission of Jones' records; he only challenges the admission of messages from his and Shields' accounts. *See Appellant's Br.* at 29 n.2.

[64] At trial, Detective Smalley explained that a "big part of the investigative process is social media research." *Tr. Vol. 7* at 34. He described searching suspects' names and known associates in "any available social media." *Id.* When Detective Smalley identifies a relevant Facebook account, he submits a preservation request and Facebook "saves a version of the information on the account as it exi[s]ts in that moment in time." *Id.* "[I]f later on I write a search warrant for records related to that account, I can reference that preservation request, and even if the account has been changed . . ., the records I receive are intact as of that moment[.]" *Id.* In this case, Detective Smalley sent preservation requests and later, search warrants for the Facebook accounts of Anderson, Shields, and Jones.

[65] The warrant for Anderson, signed July 24, 2020, sought records from the account identified by the following URL:[22] https://www.facebook.com/marcus.y.anderson. The warrant also included a screenshot of the account's homepage, including a profile picture that was

---

[22] "URL" stands for "Uniform Resource Locator," and is the address of a unique resource on the internet. *What is a URL?*, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/What_is_a_URL (last visited December 17, 2024) [https://perma.cc/76HH-F2W8].

"verified to be him" by comparison with Bureau of Motor Vehicles records. *Ex. Vol. 3* at 110. Facebook returned a Certificate of Authenticity of Domestic Records of Regularly Conducted Activity signed by the Custodian of Records and certifying it had received a warrant on July 27, 2020, and was responding with records "for the account with the identifier 100001308246632." *Ex. Vol. 1* at 192.[23] And the warrant for Shields, signed August 20, 2020, sought information "under Facebook case number 5203731" for the account identified by the following URL: https://www.facebook.com/nakeyah.shields.1[.] *Ex. Vol. 3* at 63. The Certificate of Authenticity certified Facebook had received a warrant and was providing records "for the account with identifier 100012326103170." *Ex. Vol. 1* at 187.

[66]     For each account, Facebook returned "a zipped folder with a large amount of information[,] . . . really anything associated with the account." *Tr. Vol. 7* at 35. Detective Smalley reviewed the records and located messages he felt were relevant to the investigation. These messages were sent in the immediate aftermath of the crimes and discussed Beaty, selling a gun, hiding out, and

---

[23] "Facebook assigns each user a unique number to the account." *Tr. Vol. 7* at 35. To illustrate the basis for the objections to Anderson's and Shields' records but not Jones', the warrant for Jones' records sought records from "https://www.facebook.com/profile.php?id=100008034708544." *Ex. Vol. 3* at 91. The Certificate of Authenticity certified it was providing records "for the account with the identifier 100008034708544." *Ex. Vol. 1* at 176. All three Certificates of Authenticity included Facebook's "unique number," but there is not a similar one-to-one comparison between the search warrants and the Facebook records for Anderson and Shields.

leaving the area.  The State copied the pages containing those messages, redacted irrelevant messages, and offered them into evidence.

[67]     When the State offered the Facebook exhibits, the trial court held a hearing outside the presence of the jury at which all three defendants made their objections to "all the Facebook material [the State is] trying to enter." *Tr. Vol. 7* at 36.[24]  Anderson's counsel objected to admission of his records because the certification purported to authenticate an identifier number but there was no identifier number referenced in the search warrant for Anderson's account, so there was "no nexus shown between the records and the certification." *Id.* at 41.

[68]     As to Anderson's records, the State responded:

> Yes, Marcus Anderson's [warrant] does not indicate necessarily a Facebook provided identification number.  It does, however, provide the URL for the account for which the records are being sought, that being Marcus Anderson.
>
> It does display the photograph of the Facebook page that indicates both the vanity name, Marcus Anderson, as well as the photographs that are contained within that initial . . . Facebook page.  It has a screenshot of that information.
>
> I think that the information that is contained within the warrant does contain a nexus between Marcus Anderson and the events

---

[24] Because of the way the trial court conducted the hearing, each attorney only made a specific objection to the introduction of their client's records, but it is clear from context they all objected to the introduction of the records of each defendant.

that have occurred as well as the specific records that are being returned. . . . The [Facebook] affidavit . . . contains Facebook's unique identifier, however, within the records themselves, the identifier is tied to the name of Marcus Anderson[.]

So I do believe that there is sufficient nexus between the records, the affidavit, the search warrant to give these the reliability that these records are what they are.

*Tr. Vol. 7* at 42; *see also id*. at 50 (State responding generally to all objections that the records "are what they purport to be. They are reliable, they should be admitted as certified business records."). The trial court admitted the Facebook records of each defendant.

[69] We review a trial court's decision on the admission of evidence only for abuse of discretion. *McCoy v. State*, 193 N.E.3d 387, 390 (Ind. 2022). Reversal is warranted "only if the trial court's ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id.*

[70] To properly authenticate a piece of evidence as a condition precedent to its admissibility, the proponent is required to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). There are a variety of ways to authenticate an item of evidence, including "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Evid. R. 901(b)(4). Absolute proof of authenticity is not required; an item is admissible if the evidence establishes "a reasonable

probability the evidence is what it is claimed to be." *Calvert v. State*, 177 N.E.3d 107, 111 (Ind. Ct. App. 2021), *trans. denied.* Once a reasonable probability is shown, "any inconclusiveness of the evidence's connection with the events at issue goes to evidential weight, not admissibility." *Richardson v. State*, 79 N.E.3d 958, 962 (Ind. Ct. App. 2017), *trans. denied.* Authentication of an exhibit can be established by either direct or circumstantial evidence. *Smith v. State*, 179 N.E.3d 1074, 1078 (Ind. Ct. App. 2022).

[71] "Due to the inherent anonymity of social media, the author of posts or other communications made through this medium can be difficult to confirm[.]" *Wisdom v. State*, 162 N.E.3d 489, 494–95 (Ind. Ct. App. 2020), *trans. denied.* In cases where the State seeks to establish the author of incriminating textual communications made through social media accounts, evidence of the account's owner is often necessary to authenticate those statements. *Id.* at 494. A proponent can verify a social media account's owner by providing distinctive characteristics unique to the account and the alleged owner. *See Richardson*, 79 N.E.3d at 963; Evid. R. 901(b)(4). In *Richardson*, we held a statement made in Facebook messages was not properly authenticated because the defendant did not present evidence the Facebook account belonged to the victim nor did he "present any other indicia of reliability establishing [the victim] as the author of the contested statement." 79 N.E.3d at 964.

[72] Anderson claims there is no "common identifier" between the accounts identified by URL in the search warrants and the records Facebook certified by numeric identifier. *Appellant's Br.* at 30. He argues that although the Facebook

records "belong to *a* Marcus Anderson," there is no evidence they belong to "the Marcus Anderson on trial." *Id.* at 29–30. Anderson argues the same with respect to Shields' records. It is true neither Anderson's nor Shields' unique Facebook numeric identifier is referenced in the search warrants. But the State did present "other indicia of reliability." The URL is a unique identifier in itself. The search warrant for Anderson's records also included a screenshot of the account's homepage with a picture of Anderson, and the warrant for Shields' records included a Facebook case number, each of which could help Facebook identify the correct account.

[73] Moreover, the records themselves establish a reasonable probability the records are what the State claims they are. Anderson does not challenge the authentication of Jones' Facebook records. There was a common identifier between the Jones search warrant and the records provided in response. Those unchallenged records show Jones, with a numeric identifier ending 08544, communicated with Nakeyah Shields, with a numeric identifier ending 03170. *See, e.g.*, *Ex. Vol. 1* at 177. Shields' numeric identifier in Jones' records is the same number as in the Facebook certification of Shields' records. *See id.* at 187. In turn, Shields' records show she communicated with Marcus Anderson, with a numeric identifier ending 46632, the same identifier as in the Facebook certification of Anderson's records. *See id.* at 188, 192. And finally, Anderson's records show he communicated with Jones' account, with a numeric identifier ending 08544. The contents of the messages include references to and screenshots of the BOLOs from the Zandy robbery.

The State presented distinctive characteristics linking Shields and Anderson to the Facebook accounts used as evidence at trial. Even if the evidence was not indisputable proof of account ownership, such proof was not required. *Calvert*, 177 N.E.3d at 111. Any lingering doubts about the authenticity of each account go to the evidentiary weight of the messages, not their admissibility. *See Richardson*, 79 N.E.3d at 963. The trial court's decision to admit this Facebook evidence was not clearly against the logic and effect of the facts and circumstances before it.

## 4. Anderson's sentence is not inappropriate.

Finally, Anderson asks us to revise his sentence. The Indiana Constitution authorizes this Court to review and revise a trial court's sentencing decision as provided by rule. Ind. Const. art. 7, § 6. Indiana Appellate Rule 7(B) provides we may revise a sentence authorized by statute if, "after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The principal role of appellate review is to leaven the outliers, not to achieve a perceived correct sentence in each case. *Conley v. State*, 183 N.E.3d 276, 288 (Ind. 2022). Therefore, "we reserve our 7(B) authority for exceptional cases." *Faith v. State*, 131 N.E.3d 158, 160 (Ind. 2019) (per curiam).

"[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). "Such deference should prevail unless overcome by

compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). The two prongs of 7(B) review are "separate inquires to ultimately be balanced in determining whether a sentence is inappropriate." *Lane v. State*, 232 N.E.3d 119, 126 (Ind. 2024) (quoting *Conner v. State*, 58 N.E.3d 215, 218 (Ind. Ct. App. 2016)). "[T]o the extent the evidence on one prong militates against relief, a claim based on the other prong must be all the stronger to justify relief." *Id.* at 127.

[77] The question "is not whether another sentence is more appropriate; rather, the question is whether the sentence imposed is inappropriate." *Helsley v. State*, 43 N.E.3d 225, 228 (Ind. 2015) (quoting *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008)) (emphasis omitted). Whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224. The defendant bears the burden of persuading us a revised sentence is warranted. *See Hall v. State*, 177 N.E.3d 1183, 1197 (Ind. 2021).

[78] Anderson was convicted of felony murder—which carries a sentencing range of forty-five to sixty-five years, with an advisory term of fifty-five years—and eight Level 3 felonies—which each carry a sentencing range of three to sixteen years, with an advisory sentence of nine years. I.C. §§ 35-50-2-3, -5(b). The trial court

sentenced Anderson to sixty years for felony murder, thirteen years for each robbery or attempted robbery conviction, and ordered the sentences to be served consecutively, for a total sentence of 164 years. The individual sentences were above the advisory, but below the maximum sentences authorized by statute.

[79] To his credit, Anderson acknowledges there was "no justification" for the crimes. *Appellant's Br.* at 43. But he claims the nature of his offenses could have been worse in that he participated in crimes of impulse and opportunity while high rather than committing calculated acts while clear-headed. We are unconvinced this portrays the crimes in a more positive light. Anderson and his companions arrived in downtown Indianapolis after chaos had already erupted. They could have stayed away. Instead, they capitalized on law enforcement's focus on the unruly crowds to commit several crimes in an extremely short period of time. *See Tr. Vol. 8* at 85 (trial court noting "there were nine victims in 15 minutes on May 30th, 2020"). The video of the Zandy robbery shows they were wearing surgical gloves, reflecting some degree of planning. They demonstrated complete disregard for the safety of others, gratuitously hitting and kicking their victims, firing a gun near them, and ultimately shooting Beaty from behind.

[80] As for his character, Anderson primarily highlights the difficult circumstances of his childhood and his mental health struggles, which go hand-in-hand with his substance use, as he self-medicates with illegal drugs. The trial court found all these things to be mitigating factors and—as noted above—did not sentence Anderson to the maximum authorized sentence. We, too, acknowledge the

hardships Anderson faced growing up, including being one of eleven children living in extreme poverty, the loss of his mother, and his father abruptly moving him from his childhood home. The trial court accounted for these circumstances in fashioning a sentence, and we cannot say they warrant further revision of Anderson's sentence, especially when considering other facets of Anderson's character. Anderson's criminal history, albeit brief, includes four arrests as an adult, with one felony conviction for robbery resulting in bodily injury and one misdemeanor conviction for domestic battery. Anderson was released to probation in January 2020 for the felony conviction and committed these crimes four months later while still on probation. He was alleged to have violated his probation several times, including with the commission of these offenses.[25] While incarcerated awaiting trial and sentencing in this case, Anderson committed four conduct violations. Anderson's previous conviction for robbery is especially relevant here. *See Dean v. State*, 222 N.E.3d 976, 991 (Ind. Ct. App. 2023) (noting the significance of a defendant's criminal history "varies based on the gravity, nature, proximity, and number of prior offenses in relation to the current offense") (citation omitted), *trans. denied*. And his overall criminal history shows a continuing disregard for the rule of law and for the peace and property of other people, which reflects poorly on his character. *See*

---

[25] The other alleged probation violations were primarily for failing to submit to a drug test or report to probation as directed.

*id.* (explaining even a minor criminal history reflects poorly on a defendant's character).[26]

[81] Anderson acknowledges consecutive sentences are warranted when multiple victims suffer separate harms but asks we revise his consecutive sentences to concurrent sentences. *See Appellant's Br.* at 47–48. "Whether the counts involve one or multiple victims is highly relevant to the decision to impose consecutive sentences if for no other reason than to preserve potential deterrence of subsequent offenses." *Cardwell*, 895 N.E.2d at 1225. Consecutive sentences also acknowledge the dignity of each individual victim. *See Serino v. State,* 798 N.E.2d 852, 857 (Ind. 2003)*.* We will not substitute our judgment for the trial court's. *See Stephenson*, 29 N.E.3d at 122. Anderson's sentence, though lengthy, is not an outlier requiring correction.

## Conclusion

[82] Anderson waived appellate consideration of the amendment of his charges, but regardless, there was no error. He was not denied a fair trial by the trial court's denial of his request for more time to conduct voir dire. The trial court did not

---

[26] We agree with Anderson that the State overstated his role in arguing Anderson's conduct does not warrant sentence revision. First, it says Anderson "was a leader or central character of the crimes since he held Zandy down at gunpoint, allowing his codefendants to riffle through her car." *Appellee's Br.* at 40–41. There was no evidence Anderson had a gun during the Zandy robbery. Then the State says "as a result of being downtown that night with Anderson, Murrell died." *Id.* at 41. There is no evidence from which it could be inferred Anderson had anything to do with Murrell's death. These statements did not factor into our decision.

err in admitting social media evidence, and Anderson's sentence is not inappropriate.

[83] Affirmed.

May, J., and Vaidik, J., concur.

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Marion County Public Defender Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Steven J. Hosler
Deputy Attorney General
Indianapolis, Indiana